**BOSTON AND MAINE RAILROAD,**
Defendant, Appellant,

v.

**Isabelle C. TALBERT, Administratrix,**
**Plaintiff, Appellee.**

**No. 6651.**

United States Court of Appeals
First Circuit.

Heard April 4, 1966.

Decided May 4, 1966.

1. 243 F.Supp. at 44.

E. Paul Kelly, Nashua, N. H., with whom Sheehan, Phinney, Bass & Green, Manchester, N. H., was on brief, for appellant.

John H. Sanders, Concord, N. H., with whom Gilbert Upton and Upton, Sanders & Upton, Concord, N. H., were on brief, for appellee.

Before ALDRICH, Chief Judge, and McENTEE and COFFIN, Circuit Judges.

McENTEE, Circuit Judge.

This is an action to recover damages under the Federal Employers' Liability Act [1] for injuries and death sustained by plaintiff's husband, Vaughan C. Talbert, as the result of a collision between defendant's Buddliner [2] on which Talbert was the conductor, and a one ton truck

---

1. 45 U.S.C. § 51 provides in part as follows:

"Every common carrier by railroad while engaging in commerce between any of the several States * * * shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce, or, in case of the death of such employee, to his or her personal representative, * * * for such injury or death resulting *in whole or in part from the negligence* * * * of such carrier * * *." (Italics ours.)

2. A Buddliner is a single car used for carrying passengers. It has a self contained diesel powered unit which the engineer operates from a cab or small compartment at the head of the car.

carrying tanks of propane gas, owned and operated by one Robert Wrenn. The accident occurred on the morning of December 7, 1960 at the Hills Ferry Road grade crossing in Nashua, New Hampshire. The Buddliner was travelling southerly on its way to Boston. Wrenn was going in a westerly direction over this grade crossing. Talbert was standing on the left side of the engineer's cab filling out his records when the collision occurred. He was pinned on the floor of the cab with both legs crushed. He also received severe burns when a propane gas tank which had become lodged in the cab caught fire and exploded. He was removed from the cab some ten or fifteen minutes after the collision and taken to the hospital in Nashua where he died some three hours later.

After an extended trial the jury returned a verdict for the plaintiff in the sum of $113,780.50. The case comes to us on the appeal of the railroad from the district court's denial of its motions for judgment notwithstanding the verdict, new trial and for a remittitur.

■■ Under the statute upon which liability is predicated here[3] plaintiff must show that the injury and death of this employee resulted in whole or in part from the negligence of the defendant railroad. In New York, New Haven and Hartford Railroad Co. v. Dox, 249 F.2d 572 (1st Cir. 1957), we held that the plaintiff has the burden of proving negligence and proximate cause. However, in reviewing the jury's verdict on the question of liability we must be guided by the principles laid down in Rogers v. Missouri Pacific R. Co., 352 U.S. 500, 506, 77 S.Ct. 443, 448, 1 L.Ed.2d 493 (1957), a Federal Employer's Liability Act case, in which the Supreme Court said:

"Under this statute the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought. It does not matter that, from the evidence, the jury may also with reason, on grounds of probability, attribute the result to other causes, including the employee's contributory negligence. Judicial appraisal of the proofs to determine whether a jury question is presented is narrowly limited to the single inquiry whether, with reason, the conclusion may be drawn that negligence of the employer played any part at all in the injury or death." (Footnotes omitted)

The negligence upon which plaintiff relies is that the railroad failed to maintain a reasonably safe crossing and hence negligently failed to provide plaintiff's husband with a reasonably safe place to work.

Hills Ferry Road is a two lane public highway about seventeen feet in width which is surfaced with a bituminous material to the west and for a short distance to the east of the grade crossing in question. It runs easterly from U. S. Route 3 over this crossing to the Merrimac River. The railroad tracks run north and south and Hills Ferry Road intersects them at right angles. There are three tracks. The north bound one is in the middle. On the east is a spur track which services the nearby Koppers Company plant, and the south bound track, on which this accident occurred, is on the far westerly side of the crossing. The only warning devices were an advance warning disc[4] and the traditional cross buck, both of which were on the westerly approach to the crossing. The cross buck is located about one hundred feet west of the crossing on the northerly side of Hills Ferry Road. It is mounted on a pole about ten feet high and reads: "Railroad Crossing." Just below it on the same pole is a sign which reads: "3 tracks." The warning disc was located somewhat further west on Hills Ferry Road. The tracks are part of the defendant's main Montreal-Boston line. At

3. See n. 1.

4. This is a circular disc with the letters RR and a diagonal cross.

the time of the accident fourteen passenger trains and an occasional freight were going through this crossing every week day. In addition, a Nashua yard train used it several times a week to service the Koppers Company. There is evidence that a considerable amount of vehicular traffic passes east and west through this grade crossing.

Wrenn, the owner and operator of the ill-fated truck, was familiar with the crossing. There was evidence that he had used it about two hundred times in the five years prior to the accident to make deliveries of propane gas to the Koppers Company plant.[5] On the morning of December 7, 1960, Wrenn was proceeding southerly along Koppers Road towards Hills Ferry Road after making his second delivery to Koppers that morning. With him, seated to his right, were his wife and their two small children. The truck was travelling fifteen to twenty-five miles an hour. Due to the construction of the truck, his rear view was blinded. There was a Koppers Company switcher engine on the gondola track to which a box car was attached. This obstructed Wrenn's view of the defendant's tracks. Defendant's Buddliner approached the grade crossing at a speed of seventy miles an hour. It was blowing its whistle in long and short blasts as required by railroad regulations. The Koppers Company switcher was also sounding its whistle up to the time of the collision.

The evidence indicates that the truck's speed remained constant right up to the Koppers Road exit, where, without stopping, it made a right angle turn on to the grade crossing. The engineer on the Buddliner testified that he first saw the truck proceeding down Koppers Road when the train was about 850 feet north of the crossing. It disappeared from his view momentarily behind the Koppers switcher and box car but reappeared as it proceeded to make a right turn from Koppers Road into Hills Ferry Road about twenty-five feet from the crossing. At that time the Buddliner was 150–160 feet from the crossing and the engineer expected Wrenn to stop. When the Budd was about fifty feet from the crossing the engineer first realized that the truck was not going to stop. He applied his emergency air brakes which took effect almost instantly but was unable to avoid the collision.[6]

We cannot say that Wrenn's negligence was the sole cause of this collision as claimed by the defendant. There was ample evidence from which the jury could find with reason that the defendant was negligent in failing to maintain a reasonably safe grade crossing under the conditions that existed here and that this was a contributing cause of the accident. The evidence shows that this crossing was used by trucks and trailers hauling heavy materials; that there were two side roads which intersected Hills Ferry Road a very short distance east of this crossing;[7] that the view of defendant's tracks from Koppers Road which ran almost parallel with these tracks was frequently obstructed by the Koppers switcher moving up and down the spur and gondola tracks and that this road abruptly intersected Hills Ferry Road some twenty-five or thirty feet east of

---

5. This plant occupies a large area near this crossing, northeast of the defendant's main tracks which is accessible by a private way known as Koppers Road. This road begins at a point on the northly side of Hills Ferry Road about twenty-five or thirty feet east of the easterly side of the crossing and runs northerly almost parallel with the defendant's tracks into the Koppers Company yard. To the west of Koppers Road is an area on which there is a gondola track used frequently by the Koppers Company.

6. The truck was demolished and all its occupants were killed. The collision severed the air hose to the front wheel brakes and the Buddliner came to a stop some 1700 feet south of the crossing.

7. Koppers Road and another one which ran southerly from Hills Ferry Road into a "borrow pit" owned and used by the City of Nashua.

the crossing. South bound trains came through this intersection daily at an admitted speed of seventy miles per hour with only an advance warning disc and a cross buck, neither of which were located near enough the easterly side of the track to effectively warn on-coming traffic of the danger. In addition to the aforegoing, there was evidence that the inherent danger of this crossing was well known to the railroad for several years, and yet it did nothing to eliminate or minimize this danger. Prior to this accident there had been discussions between Koppers and the defendant with reference to installing flasher lights at this crossing but this never materialized because the defendant refused to contribute to the cost of providing them.[8]

It seems to us that under these circumstances the jury was justified in finding that the defendant did not maintain a reasonably safe crossing and therefore was negligent in failing to provide the plaintiff's husband with a reasonably safe place to work.

■ It may well be, as defendant impliedly suggests, that the crossing warnings would have been reasonably adequate if the only users were persons wholly familiar with the terrain and the frequency of railroad traffic. Had this been a suit by Wrenn's estate we might well have felt that Wrenn, who had such familiarity, was entitled to no further warning than he already had. However, if the crossing was unsafe for other users, the railroad was negligent in maintaining it, and if the additional warning might, in fact, have deterred Wrenn in this particular instance, both of which matters the jury could properly have found, then this is but an example of the F.E.L.A. principle that negligence in gross which contributes to an injury is a sufficient basis for liability even though the particular accident might not have been anticipated.

■ Also, it is our opinion that the trial court did not err in admitting evidence of the speed of the train and submitting to the jury the question of its reasonableness in the circumstances of this case. This had a bearing upon the employer's duty to provide a reasonably safe place for its employees to work.

■ We also reject the defendant's contention that it was reversible error for the trial court to admit evidence of certain nationally recognized standards concerning the design of highway and railroad crossings. It claims that these were idealistic, maximum standards—impossible of attainment and far more stringent than the commonly accepted reasonably prudent man standard applicable in these cases. It further argues that this evidence misled the jury as to the proper standard of care from the very outset of the case. In admitting this evidence, the trial court noted that it was not completely authoritative and it was for the jury's consideration like any other evidence in the case. In its charge, the trial court also correctly instructed the jury on the standard of care to be applied. In our opinion these nationally recognized standards were properly admissible as one more piece of evidence upon which the jury could decide whether the defendant acted as a reasonably prudent person in the circumstances of this case.

■ The next contention is that the exclusion by the trial court of certain opinion evidence offered by the defendant as to the adequacy of protection and the reasonable safeness of the grade crossing was prejudicial error. The defendant produced as expert witnesses the Transportation Director of the New Hampshire Public Utilities Commission and an Investigator employed by that Commission. The court excluded their testimony on the ground that this question was wholly within the province of

---

8. It was testified that Koppers offered to pay one-half of the cost of installing these flasher light warning signals but the railroad refused to contribute anything towards their cost or installation.

the jury.[9] Furthermore, neither of these witnesses qualified as engineering experts either in the design or layout of grade crossings. In A. Belanger & Sons, Inc. v. United States, etc., 275 F.2d 372, 376 (1st Cir. 1960), we said: "Whether a witness is qualified to express an expert opinion is a matter left to the sound discretion of the trial judge. In the absence of clear error, as a matter of law, the trial judge's decision will not be reversed."

In any event, we do not believe these matters of adequate protection and reasonable safeness were so far beyond the understanding of the average layman to require the use of experts for illumination. We think the jury was qualified to grasp and deal with the basic problem surrounding this collision without the aid of experts on either side—helpful as they may be. Salem v. United States Lines Co., 370 U.S. 31, 35, 82 S.Ct. 1119, 8 L.Ed. 2d 313 (1962).

■ The evidence of Talbert's income taxes and railroad retirement contributions were also properly excluded in determining the present value of Talbert's expectancy in his earning capacity. Stokes v. United States, 144 F.2d 82, 87 (2d Cir. 1944); Chicago & N. W. Ry. Co. v. Curl, 178 F.2d 497, 502 (8th Cir. 1949).

■ Nor do we find any merit in the defendant's final contention that the damages awarded to the plaintiff are excessive. Damages must be reasonable. The reasonableness of this award was challenged before the trial court by defendant's motions which were denied. It is well settled that the question of excessiveness of a verdict is primarily for the trial court and its determination thereof will not be reversed on appeal except for manifest abuse of discretion. Dubrock v. Interstate Motor Freight System, 143 F.2d 304, 307 (3d Cir. 1944). The reason for this rule is that the trial court has had the benefit of hearing the testimony, of observing the demeanor of the witnesses and also knows the com-

munity and its standards. On appeal, therefore, we are reluctant to overturn jury verdicts on the ground of excessiveness. Solomon Dehydrating Company v. Guyton, 294 F.2d 439, 447 (8th Cir. 1961). To constitute such an abuse of discretion the award must be shocking. New England Tel. & Tel. Co. v. Reed, 336 F.2d 90, 95, (1st Cir. 1964).

■ We cannot say that the trial court committed any such abuse of discretion in upholding the jury verdict here. Mr. Talbert was only forty-eight years of age at the time of his death and was survived by a forty-six year old widow. He had twenty-one years seniority with the railroad, was a steady worker and frequently worked overtime. The evidence showed that after his regular working hours he utilized his skills as a carpenter by making additions and renovations to his real estate. He was a frugal man with few personal wants. At the time of his death Talbert was earning $9,237 per year and had a life expectancy of 24.6 years. At age sixty-five he would have retired with a pension of $287 a month for the rest of his life and could have supplemented this amount by other employment. Defendant's actuary testified that the present value of Talbert's earnings and retirement discounted annually at 4%, assuming he lived his life expectancy, would be $168,000. Assuming that he used as much as one-half of his pay solely for his own benefit, which is unlikely, plaintiff would be entitled to $84,000 for monetary loss alone. In addition, plaintiff is entitled to recover for her husband's conscious pain and suffering from the time of the accident up to the time of his death. When the collision occurred Talbert was caught in the wreckage with compound fractures of both legs. His body was badly burned by the fire which resulted from the explosion of the propane gas. When removed from the cab his clothes were still in flames but he was conscious and moaning. The engineer on the Budd who ac-

---

9. The court also excluded on the same grounds similar opinion evidence offered by the plaintiff through a much more qualified expert witness.

companied Talbert to the hospital described him as "in very, very bad shape. * * * He was moaning and groaning all the while." The intense pain continued after his admission to the hospital. He was there about three hours before he died and was conscious all but one hour during that period.

The jury's verdict being a general one, we can only speculate as to what amount, if any, it awarded for conscious pain and suffering. However, we cannot say that under the circumstances the verdict was shocking, or that the trial court erred or abused its discretion in denying defendant's motions for judgment notwithstanding the verdict, new trial or for a remittitur.

All other points raised have been considered and have been found to be without merit.

Affirmed.