Robert L. TURCOTTE, Administrator of the Estate of Gerard P. Turcotte, Plaintiff-Appellee,

v.

FORD MOTOR COMPANY, Defendant-Appellant.

No. 73–1251.

United States Court of Appeals, First Circuit.

Argued Oct. 3, 1973.

Decided Feb. 13, 1974.

On Rehearing April 8, 1974.

———◆———

Paul V. Reynolds, Providence, R. I., for defendant-appellant.

John F. Dolan, Providence, R. I., for plaintiff-appellee.

Before COFFIN, Chief Judge, McENTEE, Circuit Judge, and MOORE,* Senior Circuit Judge.

McENTEE, Circuit Judge.

Plaintiff, a Rhode Island citizen, filed this diversity suit in the United States District Court for Rhode Island, seeking to recover for the alleged wrongful death of his son. The decedent was a passenger in a 1970 Maverick, manufactured by defendant Ford Motor Company, when the car was struck by another car on the Massachusetts Turnpike near Millbury, Massachusetts and burst into flames. Decedent died in the fire. The owner of the Maverick was William J. Sullivan of Woonsocket, Rhode Island, who purchased it from Menard Ford Sales, Inc., of South Bellingham, Massachusetts. The driver was Sullivan's son Michael. The operator of the other vehicle was a Massachusetts citizen.

At trial, plaintiff contended that Ford's positioning of the gas tank in the 1970 Maverick in such manner that the tank's top also served as the floor of the trunk constituted a defect in design which caused his son's death by fire. Plaintiff did not argue that the alleged defect caused the collision. Instead, he contended that, upon collision, a properly-designed Maverick would not have burst into flames and that his son would otherwise have survived the initial impact. The case went to the jury on the theory of strict liability, and a verdict was returned for plaintiff in the amount of $500,000.[1] The trial court entered judgment for that amount plus $61,315.08 in interest. Ford's motions for new trial and for alteration or amendment of the judgment were both denied. This appeal is based on a variety of issues.

## I. Conflict of Laws

The threshold issue is whether the trial court correctly decided that Rhode Island's wrongful death statute and its law on strict liability govern the instant case. Ford, a Delaware corporation, contends that Massachusetts law should have controlled. Applying the conflict of laws rules of Rhode Island, the forum state, see Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), we hold that Rhode Island law was properly invoked on both questions.

---

* Of the Second Circuit, sitting by designation.

1. Initially, plaintiff's complaint also advanced theories of negligence and breach of warranty. However, these counts were dropped at the outset of trial. Plaintiff also brought an action against William and Michael Sullivan, alleging negligence. This claim was settled prior to trial, and a joint tortfeasor release was executed by plaintiff in favor of the Sullivans for a consideration of $10,000. The release is further discussed infra.

 Rhode Island has abandoned the old *lex loci delicti* theory of conflict of laws, in which the law of the place of the tort governed, in favor of a modern "interest-weighing" approach. Woodward v. Stewart, 104 R.I. 290, 299, 243 A.2d 917, 923, petition for cert. dismissed, 393 U.S. 957, 89 S.Ct. 387, 21 L.Ed.2d 371 (1968). The Supreme Court of Rhode Island has summarized the interests it will consider under this new approach in a five-point guideline:

(1) Predictability of results.

(2) Maintenance of interstate order.

(3) Simplification of the judicial task.

(4) Advancement of the forum's governmental interests.

(5) Application of the better rule of law.

Woodward v. Stewart, *supra* at 299–300, 243 A.2d at 923; *see* Leflar, Choice-In-fluencing Considerations in Conflicts Law, 41 N.Y.U.L.Rev. 267 (1966).[2] We will consider these interests separately with respect to, first, the appropriate wrongful death statute and, second, the appropriate tort law.[3]

 Plaintiff brought this suit under the Rhode Island wrongful death statute, Gen.Laws of R.I. § 10–7–1

(1956) as amended, which measures damages by a quasi-compensatory standard with no ceiling on recovery. *See* D'Ambra v. United States, 481 F.2d 14, 19 (1st Cir. 1973), cert. denied, 414 U.S. 1075, 94 S.Ct. 592, 38 L.Ed.2d 482 (1973) (finding Rhode Island statute "partly punitive"). In contrast, the Massachusetts wrongful death statute, Mass.Gen. Laws Ann. ch. 229, § 2 (Supp.1973), measures damages by a purely punitive standard, i. e., solely by the degree of defendant's culpability rather than plaintiff's actual loss. Also, at the time of this collision recovery was limited to $50,000.[4] *See* Tiernan v. Westext Transp., Inc., 295 F.Supp. 1256, 1263 (D.R.I.1969). Application of the Massachusetts statute would thus preclude the $500,000 judgment entered for the plaintiff.[5]

 Applying the Rhode Island interest-weighing approach to this conflict of laws, we find that the fourth factor listed above, advancement of the forum's governmental interests, strongly points towards the Rhode Island wrongful death statute as more appropriate in the instant case. Rhode Island's interest here is in seeing that plaintiff, its citizen, is adequately compensated for a wrongful death. While of course the fo-

2. In a later case, Brown v. Church of the Holy Name of Jesus, 105 R.I. 322, 326–327, 252 A.2d 176, 179 (1969), the Rhode Island court listed four "factors," drawn from the Restatement (Second) of Conflicts, which it would also consider in weighing the five interests set forth in *Woodward*:
 (a) the place where the injury occurred,
 (b) the place where the conduct causing the injury occurred,
 (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and
 (d) the place where the relationship, if any, between the parties is centered.
*See* Restatement (Second) of Conflict of Laws § 145(2) (1971). We too will refer to these factors where relevant, in considering the five general interests of the Rhode Island approach.

3. In *Woodward*, the Supreme Court of Rhode Island made it clear that separate analyses of these issues are necessary. On the facts of that case, also involving an automobile

collision in Massachusetts, the court held that Rhode Island's wrongful death statute would govern the measure of damages but Massachusetts negligence law would govern defendants' conduct. *Id.*, 104 R.I. at 301, 243 A.2d at 923–924.

4. The current limit on recovery under the Massachusetts wrongful death statute is $200,000. Mass.Gen.Laws Ann. ch. 229, § 2 (Supp.1973).

5. The trial court also considered the possible applicability of the Michigan wrongful death statute, Mich.Stat.Ann. § 27A.2922 (Supp. 1973), M.C.L.A. § 600.2922, because Michigan was the place of the car's manufacture. However, there is no substantive difference between the Michigan and Rhode Island statutes. Both apply compensatory measures of damages with no ceilings on recovery. Hence, between those two statutes there is no true conflict of laws. *See* Leflar, True "False Conflicts," Et Alia, 48 B.U.L.Rev. 164, 171 (1968).

rum has some interest in protecting its citizens in any situation, such interest is particularly compelling in a tort case involving substantial personal injury or death because failure there to provide adequate compensation could mean that the plaintiffs will later become burdens on the state. *See* Tiernan v. Westext Transp., Inc., *supra* at 1264. In the instant case, this Rhode Island interest would plainly be defeated if recovery were limited to $50,000 under the Massachusetts statute. The jury found actual loss of $500,000.

■■■ Moreover, consideration of Rhode Island's interest in maintaining interstate order does not indicate contrary application of the Massachusetts statute. Under this heading, Rhode Island courts inquire whether another state's law and policy would be "offended" by application of Rhode Island law. *See* Brown v. Church of the Holy Name of Jesus, *supra,* 105 R.I. at 329, 252 A. 2d at 180. Ford is not a Massachusetts corporation. Therefore, Massachusetts does not have as immediate an interest in making available the $50,000 recovery limitation in its statute as it would if defendant were a Massachusetts citizen.

Similarly, in view of the fact that the conduct allegedly causing the injury, the design of the Maverick, occurred outside of Massachusetts, the punitive aspect of the Massachusetts wrongful death statute is of marginal relevance here. On the other hand, Massachusetts may have an interest in protecting noncitizen businesses, such as Ford, from unlimited wrongful death liability as a means of encouraging these businesses to continue operating in the state, providing local jobs and tax revenues. We first note in response to this interest that the existence of unlimited wrongful death liability in Rhode Island has not deterred Ford from continuing to supply automobile dealerships in that state. But in any event, we find that the Massachusetts interest in encouraging noncitizen business enterprises is weak in the instant case when compared to the Rhode Island interest in protecting its citizens from uncompensated harm.

■■■ The remaining three interests considered under the Rhode Island conflicts approach are either inconclusive or point to Rhode Island's statute.[6] Therefore, we hold that Rhode Island's wrongful death statute properly gov-

6. The first listed interest, predictability of results, refers to the commendable policy of enabling parties to know at the time they enter a transaction that it will produce the same set of socio-economic consequences regardless of where disputes occur. Leflar, *supra* at 282–83; *cf.* Brown v. Church of the Holy Name of Jesus, *supra* at 329, 252 A.2d at 180. As applied to the instant case, this interest compels us to inquire whether Ford had a reasonable expectation when it transferred the Maverick to a Massachusetts dealership that a wrongful death action arising from alleged defects in the car would be brought under the Massachusetts statute and whether Ford planned the transaction accordingly. We cannot find that such reasonable expectation or planning existed. Under either the old *lex loci delicti* approach to conflicts law or the modern interest-weighing approach, it was at least as likely that actions arising from the design of a car sold to a Rhode Island resident would be brought under Rhode Island's statute as under Massachusetts' statute, even though such car was purchased in Massachusetts. Moreover, although Ford has not provided us with its

insurance rate figures, we note that most interstate businesses calculate insurance rates on the assumption that there will be no state-imposed ceilings on wrongful death recoveries, contrary to Massachusetts law. *See* S. Speiser, Recovery for Wrongful Death § 13:6, at 730 (1966); *cf.* Leflar, *supra* at 311.

The interests of simplification of the judicial task and application of the better rule of law also point to Rhode Island's statute. Rhode Island courts are probably more adept at computing damages under their own compensatory standard than under Massachusetts' punitive standard and it is clear the Supreme Court of Rhode Island would find the compensatory measure with no ceiling to be the better rule of law. *Cf.* Rosenthal v. Warren, 475 F.2d 438, 445 (2d Cir. 1973), cert. denied, 414 U.S. 856, 94 S.Ct. 159, 38 L.Ed.2d 106 (1973); Tiernan v. Westext Transp., Inc., *supra* at 1264 of 295 F.Supp.; S. Speiser, *supra* § 7:4 ("The most remarkable facet of the continued existence of wrongful death damage limitations is the complete absence of logical support for them.")

erned the measure of damages in the instant case.

■ With regard to choice of appropriate strict liability law, we note first that it is somewhat unclear whether a conflict of laws in fact exists between Massachusetts and Rhode Island. Massachusetts courts apparently have never expressly adopted, or rejected, the doctrine of strict products liability. In the absence of relevant case law, the trial court and the parties proceeded on the *arguendo* assumption that strict liability would not be a permissible basis for recovery in Massachusetts.[7] In contrast, Rhode Island has expressly adopted this doctrine. Ritter v. Narragansett Elec. Co., 109 R.I. 176, 187, 283 A.2d 255, 261 (1971). Moreover, the trial court in the instant case held that, if presented with the issue, the Supreme Court of Rhode Island would interpret that doctrine as authorizing liability where defects in the design of an automobile do not cause a collision but rather exacerbate the injuries resulting therefrom. The court thus found a true conflict of laws between Massachusetts and Rhode Island on strict liability which the court resolved in favor of Rhode Island law. Reviewing this second conflicts decision, we, too, will assume *arguendo* that Massachusetts would not recognize strict products liability in any form. To resolve the conflict, we again apply Rhode Island's interest-weighing approach.

Clearly Rhode Island has a significant governmental interest to advance by applying its own law on strict liability rather than the law of Massachusetts which denies recovery on that theory. Rhode Island's interest is the protection of its citizens from defective products. Such citizens include plaintiff, his son, and Sullivan, the purchaser of the Mav-

erick. Application of Massachusetts law would plainly defeat this Rhode Island interest.

At the same time, application of Rhode Island law would not appear to offend Massachusetts law and policy. We again note that Ford is not a Massachusetts corporation. Thus, even if we assume that Massachusetts' failure to adopt strict products liability represents an intention to protect that state's manufacturers from excessive liability, Ford is outside of the protected class. Even if we assume a Massachusetts interest in encouraging noncitizen manufacturers to sell their products in the state, such interest is insubstantial when the product here was sold to a Rhode Island citizen and another Rhode Island citizen allegedly died as a result of a defect in it. Massachusetts' undeniable interest in controlling driving behavior on its highways—a factor which caused the Supreme Court of Rhode Island to apply Massachusetts *negligence* law to a Massachusetts collision in the *Woodward* case, *supra*, 104 R.I. at 300–301, 243 A. 2d at 923–924—is also not a significant consideration here. Where plaintiff complains of defective design which occurred in Michigan on a car sold to a Rhode Island resident, the fact that the alleged defect had tragic results on a Massachusetts highway is something of a fortuity. The causes of the collision in Massachusetts are not at issue. Instead plaintiff alleges that once the collision occurred, from whatever cause, the defect which existed in Sullivan's car caused the death of his son. Massachusetts has no significant interest in adjudicating a claim of that nature.

The remaining three interests considered under the Rhode Island conflicts approach also indicate application of this state's strict liability law.[8] We

---

7. The court was by no means foreclosed from holding that Massachusetts would adopt the doctrine of strict liability in tort if presented with the opportunity. *Cf.* Oresman v. G. D. Searle & Co., 321 F.Supp. 449, 457 (D.R.I.1971) (accurately predicting, prior to *Ritter*, that Rhode Island would adopt the doctrine of strict liability in tort).

8. Predictability of results does not appear to be an important interest here. Ford could not reasonably foresee or plan that its liability for defects in a car delivered to a Massachusetts dealership and sold to a Rhode Island resident would be governed by Massachusetts law rather than Rhode Island law. Under either the *lex loci delicti* or the inter-

therefore hold that the trial court correctly chose to apply Rhode Island law on strict liability.[9]

## II. Strict Liability

We now review the trial court's holding that under Rhode Island law automobile manufacturers can be held strictly liable for defects in design which do not cause highway collisions but instead exacerbate injuries therefrom. This precise question has never been considered by the Rhode Island courts.[10]

We begin our analysis with the leading Rhode Island case of Ritter v. Narragansett Elec. Co., *supra*. The Supreme Court of Rhode Island there incorporated into state law the doctrine of strict products liability as expressed in Restatement (Second) of Torts § 402A (1965).[11] *Id.*, 109 R.I. at 188, 283 A.2d at 261. *See generally* Merlino, Products Liability—Revolution in the Law, 22 R. I.B.J. 9 (1973).

The *Ritter* court construed this rule as contemplating, "first, that there must be a defect in design or manufacture which makes the product unsafe *for its intended use*, and second, that liability does not attach unless the plaintiff was using the product in a way in which *it was intended to be used* when he was injured by it." 109 R.I. at 190, 283 A.2d

---

est-weighing approach, Rhode Island law was at least as likely to govern. Ford has not provided the court with its specific insurance rates, which might have indicated that it planned otherwise. We note that generally products liability insurance is computed on a national basis, not state-by-state. *See* McCreight, The Actuarial Impact of Products Liability Insurance Upon Choice of Law Analysis, 88 Ins.L.J. 335, 342–43 (1972).

Simplification of the judicial task might seem to point to application of Massachusetts law because obviously it is simpler to apply a rule denying any recovery on strict liability grounds than to grapple with the intricacies of that doctrine. But Rhode Island's courts, having adopted strict liability, have committed themselves to dealing with its interpretation in difficult cases. *Cf.* Brown v. Church of the Holy Name of Jesus, *supra*, 105 R.I. at 329–330, 252 A.2d at 180–181 (rejecting proposition that simplification of task resulting from application of Massachusetts charitable immunity doctrine warrants that outcome). With regard to the better rule of law, the *Ritter* case *supra*, makes clear Rhode Island's approval of the doctrine of strict liability. And we hold today, *infra*, that the Rhode Island courts would extend that doctrine to encompass strict liability for design defects.

9. Like Rhode Island, Michigan's courts have adopted the doctrine of strict liability but have not yet had occasion to accept or reject extension of that doctrine to encompass liability for defective design which exacerbates injury resulting from collisions. *But see* Larsen v. General Motors Corp., 391 F.2d 495 (8th Cir. 1968) (construing Michigan law). However, even if we assume that Michigan would reject liability for defective

design and thus conflict with Rhode Island, the Rhode Island interest-weighing approach to conflicts clearly points towards application of Rhode Island strict liability law where the car was sold to a Rhode Island citizen. Michigan's single contact here is that the car was designed there. A holding that the law of the state of design must govern would mean that Michigan's courts would in effect be deemed the single source of law on defective automobile design in this country. *Cf.* Hardman v. Helene Curtis Indus., Inc., 48 Ill.App.2d 42, 59, 198 N.E.2d 681, 689 (1964).

10. It is clear that strict liability applies under Rhode Island law when a defect is alleged to have caused an automobile collision. *See* Kelly v. Ford Motor Co., 290 A.2d 607, 608–609 (R.I.1972).

11. "Special Liability of Seller of Product for Physical Harm to User or Consumer

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

at 262 (emphasis added); *see* Greenman v. Yuba Power Prods., Inc., 59 Cal.2d 57, 64, 27 Cal.Rptr. 697, 701, 377 P.2d 897, 901 (1963).

Ford argues that since no automobile manufacturer or consumer would rationally intend his car to be involved in a highway collision, the defect in design alleged in the instant case falls outside the scope of the strict liability doctrine as construed in *Ritter*. This pinpoints the crucial issue before us, namely, whether under Rhode Island law the tort concept of "intended use" encompasses foreseeable consequences of normal automobile use, such as collisions, even though such consequences are not literally intended or desired.

Among other jurisdictions there has developed a split in authority on this question, symbolized by the conflicting cases of Evans v. General Motors Corp., 359 F.2d 822 (7th Cir. 1966), cert. denied, 385 U.S. 836, 87 S.Ct. 83, 17 L.Ed. 2d 70 (1967), and Larsen v. General Motors Corp., 391 F.2d 495 (8th Cir. 1968). In *Evans*, the Seventh Circuit held that under Indiana law "[t]he intended purpose of an automobile does not include its participation in collisions with other objects, despite the manufacturer's ability to foresee the possibility that such collisions may occur." 359 F.2d at 825. The court therefore affirmed dismissal of a complaint alleging negligence, breach of implied warranty and strict liability in a fact situation analogous to the case at bar. *Accord*, Shumard v. General Motors Corp., 270 F.Supp. 311 (S.D.Ohio 1967) (construing Ohio law); Willis v. Chrysler Corp., 264 F.Supp. 1010 (S.D.Tex.1967) (construing Texas law); Walton v. Chrysler Corp., 229 So. 2d 568 (Miss.1969).

However, the Eighth Circuit in *Larsen*, construing Michigan law, rejected the *Evans* position as "much too narrow and unrealistic." 391 F.2d at 502.

"While automobiles are not made for the purpose of colliding with each other, a frequent and inevitable contingency of normal automobile use will result in collisions and injury-producing impacts. No rational basis exists for limiting recovery to situations where the defect in design or manufacture was the causative factor of the accident, as the accident and the resulting injury, usually caused by the so-called 'second collision' of the passenger with the interior part of the automobile, all are foreseeable."

*Id.; see* 80 Harv.L.Rev. 688, 689 (1967). Although *Larsen* was a negligence case, other courts have carried over its rejection of the narrow *Evans* view of "intended use" to the strict liability area. *See, e. g.*, Bremier v. Volkswagen of America, Inc., 340 F.Supp. 949 (D.D.C.1972) (construing Maryland law); Dyson v. General Motors Corp., 298 F.Supp. 1064 (E.D.Pa.1969) (construing Pennsylvania law).

We agree with the trial court that Rhode Island would adopt the *Larsen* interpretation of "intended use" in construing the doctrine of strict products liability. A literal *Evans*-type interpretation of "intended use" fails to recognize that the phrase was first employed in early products-liability cases such as *Greenman, supra*, merely to illustrate the broader central doctrine of foreseeability. The phrase was not meant to preclude manufacturer responsibility for the probable ancillary consequences of normal use. *See* Hall v. E. I. Du Pont De Nemours & Co., 345 F. Supp. 353, 363 (E.D.N.Y.1972). Instead, a manufacturer "must also be expected to anticipate the environment which is normal for the use of his product and . . . he must anticipate the reasonably foreseeable risks of the use of his product in such an environment." Spruill v. Boyle-Midway, Inc., 308 F.2d 79, 83–84 (4th Cir. 1962); *cf.* Raymond v. Riegel Textile Corp., 484 F. 2d 1025 (1st Cir. 1973) (manufacturer held strictly liable where nightgown burst into flames within two seconds of contact with hot grill of electric range). *Larsen* and its progeny have recognized that the "environment" in which cars are used, our nation's crowded, highspeed highways, makes involvement in

collisions foreseeable to manufacturers as an inevitable consequence of normal use and thus imposes upon them a duty to guard against needlessly aggravated injuries.

Indeed, the *Ritter* case itself contains a similar construction of the "intended use" concept, although not in an automobile context. In that case, a four-year-old girl opened the drop-type oven door of an electric range and stood upon it so that she could see into a pot on the top of the range. Her weight upon the opened oven door caused the range to topple over upon her and her sister. The action against the manufacturer and the distributor of the range alleged that the range's capacity to tip over when weights equal to that of the child were placed on the oven door constituted a defect in design for which defendants were liable on theories of negligence and strict liability. Obviously, an oven door is not intended to serve as a stepping-stool for children. Yet in its opinion remanding the case for trial on both theories, the Supreme Court of Rhode Island rejected defendants' contention that the child's use of the oven door constituted an "abnormal" or "unintended" use as to which there could be no liability. "[The trial judge] concluded that the jury could find from [the] evidence that [the manufacturer] knew that as a result of the design of the range the danger in the use of the oven door as a shelf was foreseeable and that the jury could have found that it had been negligent in failing to give notice or warning that such a condition would result from such a use of the oven door. We agree." 109 R.I. at 185, 283 A.2d at 260.

In view of the *Ritter* holding on "intended use," it is difficult to see how the Rhode Island courts could reject the similar *Larsen* approach to "intended use" in the automobile context. We are also mindful of the following language from a Vermont decision, Rothberg v.

Olenik, 128 Vt. 295, 305, 262 A.2d 461, 467 (1970), which was adopted by the Supreme Court of Rhode Island in Padula v. J. J. Deb-Cin Homes, Inc., 298 A.2d 529, 531 (R.I.1973):

"The law should be based upon current concepts of what is right and just and the judiciary should be alert to the never-ending need for keeping its common law principles abreast with the times. Ancient distinctions which make no sense in today's society and tend to discredit the law should be readily rejected. . . ."

Ford has suggested that adoption of the *Larsen* concept of "intended use" in automobile cases will result in its having to produce expensive armored tanks so as to avoid liability for defective design. But this need not be the result. First, plaintiff must still prove that the particular car's design constituted a "defective condition unreasonably dangerous" to the user, and that such defect was the actual and proximate cause of injuries beyond those caused by the collision itself. Ford claims that sympathetic juries will shirk their responsibilities in cases of serious injury and impose liability on the manufacturer no matter what the state of the design or the ferocity of the particular collision. But our review of cases to date shows that juries continue to confound the cynical. For example, both Marshall v. Ford Motor Co., 446 F.2d 712 (10th Cir. 1971) (Oklahoma law), and Gray v. General Motors Corp., 434 F.2d 110 (8th Cir. 1970) (Minnesota law), are cases where juries given *Larsen*-type instructions on "intended use" nevertheless returned verdicts for defendant car manufacturers because they found the particular cars were not defectively designed. Moreover, an arbitrary jury verdict on the defect or causation issues can be rejected by trial or appellate courts as not supported by the evidence.[12]

12. We reject, however, Ford's contention that the jury verdict in the instant case was not supported by the evidence. An expert witness who examined the car testified that the gas tank design constituted a "defective condition unreasonably dangerous" to the user, taking into account the safer tank design of comparable cars manufactured at the time

Second, the defense of assumption of risk remains viable in products liability cases. *See* Restatement (Second) of Torts § 402A, Comment *n* (1965). Thus, where a design defect is apparent or made known to the automobile purchaser, an action alleging such defect as the cause of injury cannot lie. *Cf.* Burkard v. Short, 28 Ohio App.2d 141, 148, 275 N.E.2d 632, 636–637 (1971) (rejecting liability for obviously unpadded dashboard). Automobile manufacturers might often relieve themselves of design liability, at least when the purchaser is plaintiff, if they fully informed such purchaser in advance of the relative safety merits and demerits of their cars as compared to other models.[13]

### III. Damages

Our holdings in the first two sections of this opinion affirm the jury verdict of liability on the part of Ford. We now consider issues concerning the jury's award of $500,000 in damages. Ford contends that the compensation provision of the Rhode Island wrongful death statute, Gen.Laws of R.I. § 10–7–1.1 (Supp.1972), was improperly applied by the plaintiff's expert witness on the question of damages. We agree, and remand the case for a new trial on the damages issue only.

The Rhode Island wrongful death statute is not a true survivor's statute on the order of Lord Campbell's Act, 9 & 10 Vict., ch. 93 (1846), or the Federal Employers' Liability Act, 45 U.S.C. § 51 et seq. (1970). In other words, the Rhode Island statute does not measure damages by the amount the surviving plaintiff could expect to have received from decedent had he lived. Instead, the Rhode Island statute is an estate-type statute, which thinks of the death in terms of economic loss to the decedent rather than to his survivors. Under this type of statute, the lifetime earnings of the decedent are projected, lifetime expenses are estimated and deducted, and the present value of the resulting sum is awarded to the plaintiff. *See* D'Ambra v. United States, *supra* at 16 of 481 F. 2d. The estate-type method of computing damages was initially established in Rhode Island in McCabe v. Narragansett Elec. Lighting Co., 26 R.I. 427, 59 A. 112 (1904). In 1971, in apparent response to a decision by this court, Williams v. United States, 435 F.2d 804 (1st Cir. 1970), the Rhode Island legislature codified the estate-type computation method by enacting § 10–7–1.1.[14]

and the danger of fire created by the Maverick's design. The expert further testified that but for the Maverick's design the fire which killed decedent would not have entered the interior of the car. The jury was entitled to accept these conclusions.

13. Of course, a purchaser might not be found to have assumed the risk of a known defect if the defect also existed in all other models, so that he had no meaningful choice on the matter. More generally, despite the statement in Comment *n* of the Restatement, some states may choose to abolish or greatly limit the defense of assumption of the risk in the purchaser-seller situation, choosing to view injury there as a casualty incident to a profitable business enterprise equipped to distribute the costs of enterprise among its beneficiaries according to principles of insurance. 2 F. Harper & F. James, The Law of Torts § 21.5, at 1182–83 (1956).

14. Gen.Laws of R.I. § 10–7–1.1 (Supp.1972):
"Pecuniary damages—How determined.— Pecuniary damages to the beneficiaries de-

scribed under § 10–7–2 of this chapter ["Action by executor or administrator, etc."] and recoverable by such persons shall be ascertained as follows:
 1. Determine the gross amount of the decedent's prospective income or earnings over the remainder of his life expectancy, including therein all estimated income he would probably have earned by his own exertions, both physical and mental.
 2. Deduct therefrom the estimated personal expenses that the decedent would probably have incurred for himself, exclusive of any of his dependents, over the course of his life expectancy.
 3. Reduce the remainder thus ascertained to its present value as of the date of the award. In determining said award, evidence shall be admissible concerning economic trends, including but not limited to projected purchasing power of money, inflation and projected increase or decrease in the cost of living."

In challenging the size of the verdict, Ford raises three issues concerning § 10–7–1.1: (1) was a projection of decedent's lifetime income properly based on a government publication which encompassed all college graduates, including those who also attend graduate or professional schools? (2) was consideration of income taxes properly omitted in determining decedent's lifetime expenses? (3) were future inflation and increases in productivity properly accounted for?

■ The first issue has little merit. At trial Mark Schupack, an economics professor at Brown University, testified as an expert witness for plaintiff with respect to the probable lifetime earnings and expenses of decedent. Schupack presented the jury with a series of calculations based on varying factual assumptions, first, as to decedent's future education and career, and second, as to future prevailing interest rates. Ford contends it was error for Schupack, when making the factual assumption that decedent would have been a college graduate, to project future earnings based on a Bureau of Census publication which covered all college graduates, including those with postgraduate education. It is clear that decedent stood a good chance of attending and graduating from a four-year college. He had good grades and an outstanding athletic record. Indeed, the most poignant aspect of the case is that decedent was en route with three friends to look over the University of Massachusetts campus at Amherst when the crash and fire which took his life occurred.[15]

Although we have no way of knowing for sure, it is possible that decedent would have gone on beyond college to some form of postgraduate education. But more important, the fact that the census publication relied upon by Schupack included college graduates with postgraduate education does not mean that the resulting income figures were much higher than they would have otherwise been. As Schupack noted at trial, great numbers of persons with graduate degrees, such as teachers, earn less than the average person with only a bachelor's degree. The Rhode Island statute obviously requires a great deal of speculation. It requires the judge and jury to take on "the joint role of soothsayer and mathematical analyst in order to foretell what the future held for the deceased." Romano v. Duke, 304 A.2d 47, 51 (R.I.1973). In this context, we cannot find that Schupack's reliance on the census averages for all college graduates was so inconsistent with decedent's reasonable prospects that their admission into evidence constituted an abuse of discretion by the trial court. See Krall v. Crouch Bros., 473 F.2d 717, 719 (8th Cir. 1973) (per curiam).

■ However, on the issue of income taxes we feel there was error. To compute decedent's lifetime expenses, as required by the Rhode Island statute, Schupack reduced each annual income figure he projected by one-fourth. This 25% reduction was intended to encompass the costs of housing, food, clothing, personal and medical care, tobacco and alcoholic beverages attributable to the husband in a five-person family. Schupack made no further reduction in projected earnings for federal and state income taxes, and Ford contends that this was error. We agree. Indeed, the trial court indicated that it too would agree, if it were not for a decision by this court, Boston & Me. R.R. v. Talbert, 360 F.2d 286, 291 (1st Cir. 1966), which the trial court felt precluded deduction of income taxes.[16]

15. The record also includes letters to decedent from Brown University's admissions office and from its assistant basketball coach, both of which indicate that decedent was being sought by that highly-regarded school.

16. The court expressed its thoughts as follows:

"There is no Rhode Island precedent on this issue. And federal courts, in federal causes of action or where state law is cit-

However, our decision in *Talbert*, a federal case, did not control the trial court's holding on the admissibility of income tax evidence under Rhode Island law.[17] The "twin aims" of the doctrine of Erie R.R. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), are the "discouragement of forum shopping and avoidance of inequitable administration of the laws." Hanna v. Plumer, 380 U.S. 460, 468, 85 S.Ct. 1136, 1142, 14 L.Ed.2d 8 (1965). Under *Erie*, a state rule should be applied in a diversity case if it "would have so important an effect upon the fortunes of one or both litigants that failure to enforce it would be likely to cause a plaintiff to choose the federal court." *Id.* at 468 n. 9, 85 S.Ct. at 1142. In the instant case, if Rhode Island law required evidence of income taxes in computing wrongful death damages, yet the federal district court in Rhode Island barred such evidence in diversity cases, no rational plaintiff who had the choice would ever bring a wrongful death action in the state courts. The difference in wrongful death recoveries between the two forums would be staggering. Therefore, under *Erie*, state law must control. *Cf.* Binney v. United States, 460 F.2d 263, 264 (9th Cir. 1972) (per curiam).

Considering the matter of income taxes solely in the context of Rhode Island law, we hold that the failure of plaintiff to present evidence on the subject constituted error. The trial court itself noted that the express authorization in § 10–7–1.1 of evidence of inflation and other "economic trends" resulted in an unjustifiably large verdict because income tax evidence was excluded.[18] The admittedly speculative nature of income tax evidence cannot be deemed a barrier to its admissibility under Rhode Island law. Surely the forecasting of future inflation rates is, if anything, more speculative than the forecasting of future tax rates.

ed, have espoused a variety of approaches. [Citations omitted] The position taken by the First Circuit in a wrongful death action under the Federal Employees [sic] Liability Act is that evidence of taxes is properly excluded. Boston and Maine R. R. Co. v. Talbert, 360 F.2d 286 (1st Cir. 1960 [sic]). In support of its ruling, the Court cited Stokes v. United States, 144 F.2d 82, 87 (2d Cir. 1944) which found that such deductions are too conjectural.

"Because the statement of the First Circuit pertains to the nature of the evidence as the basis of its inadmissibility, I do not find that the fact that Boston and Maine R.R. Co. v. Talbert, *supra*, was a federal cause of action while the case before me is based on state law constitutes a significant distinction. Under the teachings of this First Circuit case, I therefore believe I am bound t̊o rule that far from the lack of evidence on taxes constituting a failure of proof on the part of the plaintiff, such evidence is inadmissible.

"I do feel constrained to remark, however, that in the context of the Rhode Island Wrongful Death Laws, I am convinced that a rule in which it would constitute error on the part of the plaintiff not to submit evidence of the erosion of income by taxation is by far the better rule. Given that economic trends are a factor under R.I.G.L. 10–7–1.1 in the computation of damages, whatever savings accrue to the plaintiff by the exclusion of evidence on the 'taxation bite,' is spiraled by the inflation multiplier. In a case such as the one at hand, in which earnings were projected for a forty-three year time span, it is readily apparent that a significant percentage of damages must be attributable to the savings on taxes. Before the heavy burden of shouldering such damages should be imposed on the defendant, a court should be able to justify such a rule on the basis of compelling policy arguments. I do not find such a convincing rationale in support of the exclusion of evidence in taxes; rather, I find that the argument for the inclusion of such evidence is persuasive."

17. Moreover, neither of the cases on which we relied in *Talbert* involved state law. *See* Stokes v. United States, 144 F.2d 82 (2d Cir. 1944) (general maritime law); Chicago & N.W. Ry. v. Curl, 178 F.2d 497 (8th Cir. 1949) (FELA).

18. The inflation and income tax factors can be thought of as countervailing forces in the computation of wrongful death damages. For example in McWeeney v. New York, N.H. & H. R.R., 282 F.2d 34, 38 (2d Cir.), cert. denied, 364 U.S. 870, 81 S.Ct. 115, 5 L.Ed.2d 93 (1960) the court in part justified its refusal to allow consideration of income taxes by its simultaneous refusal to allow consideration of inflation.

Moreover, the recent decision by the Supreme Court of Rhode Island in Romano v. Duke, *supra*, would seem to insist upon consideration of future income taxes in computing damages under § 10–7–1.1. There the court held that prospective business expenses of a self-employed decedent were properly deducted from his prospective earnings. It discussed the new statute as follows:

"Section 1 of the 1971 amendment is the General Assembly's answer to . . . the *Williams* case. There, the legislators made it clear that any probable expenditures made for the support of the decedent's dependents are to be disregarded and that, in finalizing an award, evidence concerning the future trend of the earnings, be it inflationary or deflationary, may be considered. Before any such award can be finalized, evidence must be produced as to *all* of the expenses the deceased would have had to incur to produce that estimated amount of his future earnings."

304 A.2d at 50 (emphasis in the original). It almost goes without saying that income taxes are substantial and inevitable expenses which the decedent would have had to incur to produce the amounts of future earnings estimated by Schupack at trial. In the calculations based on the assumption that the decedent would have been a college graduate, deduction of future taxes would have reduced the final net earnings by a substantial amount, even assuming the use of joint-return rates. In ordering a new trial as to damages, we expect that witnesses will discuss the past trends in federal and state income tax rates as a means of forecasting the future, in the same manner that Schupack forecast future inflation and productivity rates at the initial trial.

We next turn to Ford's contentions concerning the accounting at trial for future inflation and productivity increases. Ford argues that Schupack, after reducing decedent's projected lifetime net earnings to their present value, then simply compounded that figure by an annual rate of 5½% to reflect his forecast of future annual inflation (2½%) and productivity increase (3%).[19] If Schupack in fact did so, he committed a mathematical error which significantly increased his final damages calculations beyond what they should have been. An example using highly-simplified sums demonstrates this.[20] However, the record is unclear as to precisely how Schupack made his final adjustments for inflation and productivity. We cannot tell whether in fact he made the error which Ford suggests.

■ It does seem clear, however, that the Rhode Island damages statute does not require adjustments for inflation and productivity to be made only *after* projected earnings are reduced to

19. Ford does not quarrel with Schupack's selection of the 2½% and 3% rates, which were derived from his study of past long-term inflation and productivity increase rates.

20. Assume that a person was entering a hypothetical profession whose salary scale was such that his net earnings at the end of Year One would be $10,000, and at the end of Year Two would be $20,000. Assume further that the annual interest rate is 5%, and that the combined annual inflation-productivity rate is also 5%.

Applying the method which Ford contends that Schupack used at trial, we add the two net earnings figures to obtain total net earnings of $30,000. If we then reduce this two year total to present value at the 5% interest rate and then adjust it upward to reflect the 5% inflation-productivity rate, we would naturally arrive at a final figure of $30,000.

In contrast, if we accounted for the inflation and productivity increases in the initial determination of net earnings, we would get the following result. Net earnings at the end of Year One would be increased to $10,500. Net earnings at the end of Year Two would be increased to $22,050. Total adjusted net earnings would therefore be $32,550. The present value of this two year total at an annual interest rate of 5% is just over $29,500. Thus, there is a discrepancy favoring the plaintiff of close to $500 over a two year period. Over the forty-three year period if Schupack in fact made this error, the discrepancy would surely be far greater.

present value. The sentence in paragraph 3 of § 10–7–1.1 which authorizes consideration of "economic trends," *see* n. 14, is best interpreted as a general observation on the overall computation process. Therefore, to avoid the possibility of error suggested above, we think it advisable, upon remand, that decedent's projected lifetime earnings and expenses be adjusted to reflect future inflation and increases in productivity *before* the final net earnings figure is reduced to present value.

## IV. Joint Tortfeasor Release

The final issue in this appeal concerns the effect of a joint tortfeasor release on the extent of Ford's liability.

Prior to trial, Ford commenced a third party action against William and Michael Sullivan, the owner and driver of the Maverick, seeking contribution pursuant to Rhode Island's Uniform Contribution Among Joint Tortfeasors Act. Gen.Laws of R.I. § 10–6–1 et seq. (1956), as amended. Subsequently, the plaintiff, under Fed.R.Civ.P. 14, brought a direct claim against the Sullivans for negligence. However, before any evidence was heard, plaintiff executed a joint tortfeasor release in favor of the Sullivans for a consideration of $10,-000.[21] As a consequence, both the direct claim and Ford's third party complaint against the Sullivans were, with the acquiescence of all parties dismissed with prejudice.

Ford contends that the release thus executed by plaintiff should operate to reduce the judgment against it by the "statutory pro rata share" of the Sullivans' liability, asserted to be one-half of the awarded damages. Precisely how Ford arrived at a one-half reduction is not clear, since the evidence at trial contained no reference whatsoever to the relative proportionate shares of liability attaching to Ford and the Sullivans. As the trial court correctly determined below, before the release may operate in defendant's favor, an apportionment of legal liability must be made.[22] The release, far from establishing *any* percentage of liability on the part of the Sullivans, expressly indicates that it "is not to be construed as an admission of liability, but is a compromise of a disputed claim." Thus, Ford's attempt to reduce the judgment by one-half on the basis of the executed release has no merit.

The finding of liability is hereby affirmed. The award of damages is vacated and the case is remanded to the district court for a new trial on that issue only.

MOORE, Circuit Judge (concurring in part and dissenting in part).

I cannot bring myself to subscribe to or accept a doctrine that "our nation's crowded, high-speed highways makes involvement in collisions foreseeable to manufacturers as an inevitable consequence of normal use" of an automobile.

---

21. In pertinent part, the release executed by plaintiff states:

"I further agree that all claims or damages recoverable by me against all other persons, firms or corporations jointly or severally liable to me in tort for said damages, are hereby reduced to the extent of the statutory pro rata share of said William Sullivan and Michael Sullivan under the Uniform Contribution Among Tortfeasors Act, of all such damages so recoverable by me against all such other joint tortfeasors."

Apparently, this clause was inserted into the release agreement in an attempt to insulate the Sullivans from possible rights of contribution which may subsequently have accrued to Ford through payment of an adverse judgment. *See* Gen.Laws of R.I. § 10–6–8 (1956). Despite the possibility of prejudice to its rights, Ford seems to have accepted the appropriateness of the release by agreeing to dismiss its third party action against the Sullivans.

22. The trial court suggested that Ford must commence a new suit, presumably against the Sullivans, in order to determine their proportionate share of liability. Whether or not such a suit can be maintained, in view of the dismissal with prejudice of Ford's third party complaint, is a matter upon which we pass no judgment.

The collision here was with such force as to cause the gas tank of the vehicle struck from the rear to burst into flames. Even assuming that there was a "defective condition" in that the gas tank's top was a part of the floor of the car, to create liability it must have been "unreasonably dangerous." Collisions foreseeable, yes, but collisions of the type before us, no. It would be hard to imagine any automotive vehicle, requiring gasoline for propulsion purposes, being so designed as to avoid the possibility of a tank fire or explosion when violently struck in collision. Even army tanks caught on fire after running over field mines with a resulting explosion. In short, I think some legal significance should be given to the adverb "unreasonably." Nor can I reconcile "intended use" with collisions which "are not literally intended."

I recognize two opposing and conflicting philosophies which have developed in this field which may be referred to respectively as *Evans*[1] and *Larsen*.[2] Each has its own following (see cases cited in the majority opinion). What the highest court of Rhode Island would decide if confronted with a state of facts similar to those presented here, I do not know. I can only express my views that the *Evans* rationale to me is far more consistent with (1) the law in this field as it has developed over the years and (2) common sense as applied in a pragmatic way than *Larsen*. Nor do I find *Ritter*[3] conclusive although, of course, I must recognize that it has carried "foreseeability" well beyond previous Rhode Island decisions.

Despite my, of necessity, inconclusive views as to liability, I concur that there should be a new trial on the issue of damages. I differ only from my colleagues in believing that the method of determining damages, now having been codified in Rhode Island,

Gen.Laws of R.I. § 10–7–1.1 (Supp. 1972) should be left to the discretion of the trial judge on remand both as to the evidence admitted and as to the instructions to the jury thereon. Since as the majority state: "The Rhode Island statute obviously requires a great deal of speculation.", I would leave to the future trial judge the not-too-enviable task of endeavoring to reduce speculation to a minimum. In sum, except as necessary in the field of taxes, I would give the trial judge free rein without appellate comment to accept or reject such evidence as he may believe to be relevant to the damage issue.

## MEMORANDUM AND ORDER ON PETITION FOR REHEARING

We granted Ford's petition for rehearing on the final issue only: impact of the joint tortfeasor release. Upon consideration of supplemental briefs filed by both parties, we adhere to our original position. However, we wish to clarify our holdings as follows:

No determination of negligence on the part of the Sullivans has yet been made. The settlement and release between the Sullivans and Turcotte were not dispositive of this issue. Therefore, they cannot at this time be considered joint tortfeasors within the meaning of Gen.Laws of R. I., § 10–6–2 (Supp.1972). *See* Theobald v. Angelos, 44 N.J. 228, 208 A. 2d 129 (1965); Swigert v. Welk, 213 Md. 613, 133 A.2d 428 (1957); Davis v. Miller, 385 Pa. 348, 123 A.2d 422 (1956). While these cases concerned the right to bring into or keep in a tort litigation a putative joint tortfeasor who had given a release, their recognition of the importance to the defendant of retaining the opportunity to determine the culpability of the settling tortfeasor is also a recognition of the straits in which a defendant is placed if he allows settling tortfeasor to be absent. *See* Mazer v. Lipshutz, 360

1. Evans v. General Motors Corp., 359 F.2d 822 (7th Cir. 1966), cert. denied, 385 U.S. 836 (1967).

2. Larsen v. General Motors Corp., 391 F.2d 495 (8th Cir. 1968).

3. Ritter v. Narragansett Elec. Co., 109 R.I. 176, 283 A.2d 255 (1971).

F.2d 275 (3d Cir. 1966). While Pulvari v. Greyhound Corp., 287 F.Supp. 104 (D.D.C.1968) arguably takes a different view, we follow what we deem to be the preponderance of authority.

The cited cases indicate that despite the settlement and release the Sullivans could and probably should have been retained as parties in the original trial so that their legal liability, if any, could then have been established. Instead, Ford acquiesced in the dismissal of the Sullivans as parties. As we said in n. 22 of the original opinion, we leave it to the district court to determine if Ford is now barred from bringing a separate action against the Sullivans which might determine whether they were negligent and, if so, whether they were joint tortfeasors with respect to Gerard Turcotte's death. Should these hurdles be surmounted, there will remain the question of the basis of apportioning damages. We leave this to the district court and another day.