**Bayard W. KENNETT, Administrator of the Estate of Linnell W. Kennett, Plaintiff, Appellee,**

v.

**DELTA AIR LINES, INC., Defendant, Appellant.**

**No. 76–1482.**

United States Court of Appeals, First Circuit.

Heard April 5, 1977.

Decided July 28, 1977.

Theodore Wadleigh, Manchester, N. H., with whom Wadleigh, Starr, Peters, Dunn & Kohls, Manchester, N. H., was on brief, for Delta Air Lines, Inc.

Jack B. Middleton, Manchester, N. H., with whom Arthur G. Greene and McLane, Graf, Greene, Raulerson & Middleton, Professional Assn., Manchester, N. H., were on brief for Bayard W. Kennett, Admr. of the Estate of Linnell W. Kennett.

Before COFFIN, Chief Judge, CAMPBELL, Circuit Judge, and MILLER,* Judge.

MILLER, Judge.

Delta Air Lines, Inc. ("Delta") appeals from a judgment entered on a jury verdict in favor of plaintiff-appellee in the sum of $415,758. We affirm.

The action was for wrongful death of Linnell Kennett which resulted from a crash of Delta Air Lines Flight # 723 at Logan International Airport on July 31, 1973. Delta admitted liability in the District Court for the District of Massachusetts, and the case was remanded to the District Court for the District of New Hampshire for trial on the issue of damages pursuant to 28 U.S.C. § 1407.

Delta raises five issues, which will be disposed of under appropriate headings.

## WHETHER UPON ALL OF THE EVIDENCE PRESENTED THE JURY VERDICT WAS EXCESSIVE.

Upon return of the jury's verdict, Delta orally moved "for remittitur that the verdict was excessive and oppressive." This was denied. Subsequently, Delta filed a written motion that the verdict be set aside and a new trial ordered "on the grounds that the verdict was oppressive, excessive and contrary to the law and evidence introduced during the course of trial." This, too, was denied.

The rule on review involving the question of excessiveness of a verdict was stated by this court in *Boston & Maine Railroad v. Talbert*, 360 F.2d 286, 291 (1st Cir. 1966):

It is well settled that the question of excessiveness of a verdict is primarily for the trial court and its determination thereof will not be reversed on appeal except for a manifest abuse of discretion. . . . The reason for this rule is that the trial court has had the benefit of hearing the testimony, of observing the demeanor of the witnesses and also knows the community and its standards. On appeal, therefore, we are reluctant to overturn jury verdicts on the ground of excessiveness. . . . To constitute

---

* Hon. Jack R. Miller of the United States Court of Customs and Patent Appeals, sitting by designation.

such an abuse of discretion the award must be shocking. . . .

See *LaForest v. Autoridad de Las Fuentes Fluviales*, 536 F.2d 443, 447 (1st Cir. 1976).

The New Hampshire wrongful death statute (N.H.Rev.Stat.Ann. § 556:12) provides:

556:12 Damages for Wrongful Death, Elements. If the administrator of the deceased party is plaintiff, and the death of such party was caused by the injury complained of in the action, the mental and physical pain suffered by the deceased in consequence of the injury, the reasonable expenses occasioned to his estate by the injury, the probable duration of his life but for the injury, and his capacity to earn money during his probable working life, may be considered as elements of damage in connection with other elements allowed by law, in the same manner as if the deceased had survived.

In its instructions to the jury, the trial court carefully directed that no punitive damages were to be awarded; also that no damages were to be awarded for pain and suffering of the deceased, or for "the grief and the sorrow and the emotional anguish suffered by Linnell's husband and parents because of her death."[1] The court stated that the measure of the loss to the deceased's estate was:

the amount of money that you find that she had the capacity to earn, capacity to earn, during her working life, less her necessary living expenses. The key words are full, fair and adequate capacity to earn minus necessary living expenses.

At the time of her death, the deceased was twenty-four years of age, married, in good health, and active in social and community affairs. She had no children. It was stipulated that the life expectancy of a woman of her age would have been 53.5 years. Plaintiff-appellee presented the expert testimony of an economist, who testi-fied on the basis of two reports he had prepared: one based on the deceased's potential earnings plus the value of her homemaking services showing a net loss to the estate (after deducting necessary living expenses) of $542,600; the other based on her actual part-time earnings history plus the value of her homemaking services showing a net loss to the estate (after deducting necessary living expenses) of $427,000. The jury's verdict of $415,758 is obviously very close to the second report, and it is that report on which we will focus our attention vis-à-vis the report of Delta's economist showing a net loss to the estate of only $99,085.55, based on the deceased's potential earnings plus the value of her homemaking services minus necessary living expenses. Both economists assumed a forty-year working life expectancy in making their calculations.

One major difference between appellee's second report and Delta's report is that appellee's economist calculated the value of the deceased's homemaking services on the basis of 54.6 hours per week in addition to part-time employment of 15 hours per week. Delta's economist assumed that the deceased would normally have been employed full time and that, when so employed, "imputed values for any *part time* housekeeping would have been offset by payments by her to others for the remaining part time housework"; also, he calculated the imputed value for full time housekeeping only for the time she would have been "statistically unemployed" (4.9% of the time, representing the national average unemployment rate for women 20 years of age and over) and on a 42 hour work week basis. Both economists used the same present wage rate for employment of $112.50 per week and the same present imputed wage rate for homemaking services.

Another major difference between appellee's second report and Delta's report is that appellee's economist used a 5.6% annual

---

1. The trial court did not expressly exclude expenses occasioned to the estate by the injury, but referred to "some other elements of damages in the statute that have no particular bear-ing and no bearing at all on this case." There was evidence of the cost of a grave marker of $685.

rate of increase (compounded) in the value of the deceased's actual part-time earnings [2] and the value of her homemaking services over [3] her working lifetime, but applied a discount rate of only 4.5% (not compounded) in reducing the projected values to present values. Delta's economist used a 6.8% annual rate of increase and a discount rate of 6%.

There is a $328,000 [4] spread between appellee's computed loss to the estate and Delta's computed loss. Of that amount, $243,000 arises from the difference between the parties' calculations of the total value (discounted) of the deceased's capacity to earn money, thus:

| | |
|---|---|
| Appellee's total value | $534,000 |
| Delta's total value | 291,000 |
| Difference | $243,000 |

Most of that difference is attributable to the two major differences in the reports described above.

The remaining amount of the spread ($85,000) is attributable to the third major difference in the reports, necessary living expenses (discounted), thus:

| | |
|---|---|
| Consumption of services and nondurable goods (Delta) | $192,000 |
| Estimated personal consumption (appellee) | 107,000 |
| Difference | $ 85,000 |

Delta's economist assumed that 66% of both the deceased's earnings (discounted) from full time employment and the imputed value (discounted) for full time housekeeping (during the 4.9% of the time when she was "statistically unemployed") would be spent for "consumption of services and non-durable goods" and deducted this amount in calculating the net loss to the estate. It was his testimony that over 90 to 95% of the population spends two-thirds of its income on nondurable goods and services. On cross-examination he testified as follows:

XQ. And so . . . it doesn't matter whether you are earning $5,000.00 a year and have several children to take care of or whether you are earning $100,-000.00 a year with nobody to take care of yourself, you are going to spend 66 and two-thirds percent of your income on non-durable goods?

A. That's right. The variation in those cases is within one or two percentage points.

During further cross-examination on the subject of necessary living expenses, he testified as follows:

XQ. You know, we could compute, couldn't we, you know, how much it would cost to buy clothing today to reasonably clothe somebody, how much it would cost to feed somebody on a weekly basis, and the other essential expenses of staying alive, but in a reasonable fashion, we could compute that, couldn't we?

A. Only by asking that person what you feel is essential for your lifestyle. I cannot project my lifestyle onto someone else.

XQ. So you are saying that there is no way to determine necessary except by a completely subjective approach, the individual has to determine what is necessary?

A. That is correct.

Appellee's economist calculated personal consumption expenses (necessary living expenses) at $1,240.12 per year for 1973–84, $2,125.92 per year from 1985–2004, and $2,391.66 from 2005–14, based on statistics from the U. S. Bureau of Labor Statistics, representing the annual consumption requirements for a median standard of living in the nonmetropolitan Northeast. In computing the lifetime value, he used a 5.6% annual rate of increase and a 4.5% discount rate. Although, as Delta points out, the basic figures were derived from the annual consumption requirements for a typical

---

**2.** Calculated at $1,404.26 as the average annual earnings for the two years preceding her death.

**3.** Calculated at $9,066.72 on the basis of 54.6 hours per week spent in food preparation and dishwashing, house care, clothing care, family care, management and shopping, transportation, yard work, and "other."

**4.** This figure and those below have been rounded to the nearest $1,000.

family of four, these were adjusted to take into account the husband-wife portion and further adjusted to reflect a percentage attributable to the deceased. We note that the percentage of 14% for the years 1973–84 appears to be somewhat low compared to the 24% for the years 1985–2004 and the 27% for the years 2005–14. It is possible that the jury took this into account in awarding an amount some $11,000 less than the net loss calculated in appellee's second report.

Both economists testified at length and were subjected to extensive cross-examination. The basis for their calculations and their assumptions were clearly explained. The jury made a choice between conflicting professional opinions and judgments, which are, by no means, unusual in the economics profession. There was ample evidence to support the jury's verdict. In view of the evidence, we do not regard the verdict as "shocking." Accordingly, we hold that there was no manifest abuse of discretion by the trial court in refusing a remittitur and in denying the motion to set the verdict aside and to order a new trial.

### WHETHER THE DISTRICT COURT WAS CORRECT IN ITS CHARGE TO THE JURY ON THE NATURE AND ELEMENTS OF DAMAGES RECOVERABLE, PARTICULARLY WITH RESPECT TO THE COURT'S CHARGE ON THE DEFINITION AND DESCRIPTION OF NECESSARY EXPENSES TO BE DEDUCTED FROM LOST EARNING CAPACITY.

Under this heading, Delta states its position that "the court erred in failing to charge the jury on the definition and description of necessary expenses to be deducted from lost earning capacity," and

that "the charge given to the jury was deficient in that it limited the expenses to be deducted by the deceased during her lifetime to only those expenses necessary for the deceased to spend during her lifetime."

■ Delta made no objection to the failure of the court to follow its requested instruction to the jury on the definition and description of necessary expenses to be deducted from lost earning capacity,[5] and may not, under Rule 51, Fed.R.Civ.P.,[6] raise this issue on appeal. *Griggs v. Firestone Tire & Rubber Co.*, 513 F.2d 851 (8th Cir.), *cert. denied*, 423 U.S. 865, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975); *French v. United States*, 487 F.2d 1246 (1st Cir. 1973); *Manning v. New York Telephone Co.*, 388 F.2d 910 (2d Cir. 1968); *Dunn v. St. Louis-San Francisco Railway*, 370 F.2d 681 (10th Cir. 1966).

However, Delta did object "to the Court's definition of necessary expenses," which was as follows:

Now, there has been some testimony as to what this term "necessary living expenses" means, and let me say that I am going to define for you and tell you what the law requires you to consider as necessary living expenses. Necessary means, in the law, what is reasonably essential to living in our society, in the society that we are acquainted with, and particularly the society here in New Hampshire, where Linnell was living at the time of her death. So you determine in dollars and cents how much she would have made based on her capacity to earn. . . . You deduct from that what you feel she would have spent as reasonably essential to living in New Hampshire, and then you come up with a net figure.

---

5. Delta's requested instruction on this point was as follows:

The loss to the Estate is the measure of damage. You should consider the following in arriving at the loss to the Estate:
1. The amount the decedent would have been capable of earning in his [sic] lifetime.
2. The amount the decedent would have spent in [her] lifetime for [herself] in necessary living expenses.

6. Rule 51, Fed.R.Civ.P., provides in pertinent part as follows:

No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection. Opportunity shall be given to make the objection out of the hearing of the jury.

Delta argues that "necessary expenses are more than those necessary to maintain life and should be defined as those expenses one would expect the deceased in the position of the deceased, to expend during her probable life." However, we note that earlier in its brief (p. 3), after discussing potential lost earning capacity, Delta itself states:

> From these potential earnings must be deducted the *living expenses* of the deceased during the balance of her probable life. The balance, discounted to present day values is the measure of damages for lost earning capacity. [Emphasis supplied.]

In its objection to the trial court's instruction, Delta did not state wherein it considered the instruction to be in error. Thus, Delta is in a poor position to raise the point now. Fed.R.Civ.P. 51. *See Marshall v. Nugent*, 222 F.2d 604 (1st Cir. 1955). Indeed, in its own proffered instruction, Delta would have had the jury consider only "necessary living expenses," which the trial court defined as what the deceased "would have spent as reasonably essential to living in New Hampshire." Delta now argues that appellee's expert witness computed an "unrealistic" figure for the deceased's necessary living expenses, while its own expert witness presented a "more realistic" figure and showed that the average person, nationwide, consumes 66% of personal income in living expenses. Nevertheless, Delta has failed to show that the trial court's definition departed erroneously from the standard set forth by the New Hampshire Supreme Court in the cases cited by Delta, namely: *Roussin v. Blood*, 90 N.H. 391, 10 A.2d 224 (1938) ("separate cost of living") and *Richards v. Miller North Broad Transit Co.*, 96 N.H. 272, 74 A.2d 552 (1950) ("expense of her own living"). *See Pitman v. Merriman*, 80 N.H. 295, 117 A. 18 (1922) ("what it would cost him to live"). Moreover, we note that the subjective standard of "necessary" advanced by Delta's economist would effectively preclude a jury from making a judgment on "necessary expenses."

WHETHER THE DISTRICT COURT ERRED IN FAILING TO INSTRUCT THE JURY THAT IT SHOULD DEDUCT AN AMOUNT FROM ITS AWARD REPRESENTING THE PROBABLE AMOUNT OF INCOME TAXES WHICH THE DECEDENT WOULD HAVE HAD TO PAY OVER THE COURSE OF HER LIFE EXPECTANCY.

Delta requested, and the court declined to give, the following instruction:

DEFENDANT'S INSTRUCTION NO. 8
*INCOME TAX ON EARNINGS*

I further charge you that in calculating the claim for future loss of earnings for the decedent in this case, you must give consideration to the income taxes that would have been paid on such earnings, had the decedent survived.

Delta did not enter objection to the court's failure to give the requested instruction and may not, under Rule 51, Fed.R.Civ.P., raise this issue on appeal. *Griggs v. Firestone Tire & Rubber Co.; French v. United States; Manning v. New York Telephone Co.; Dunn v. St. Louis-San Francisco Railway*, all *supra*.

WHETHER THE DISTRICT COURT ERRED IN FAILING TO INSTRUCT THE JURY THAT ANY AWARD WOULD BE NON–TAXABLE TO THE PLAINTIFF.

Delta requested, and the court declined to give, the following instruction:

DEFENDANT'S INSTRUCTION NO. 7
*AWARD NOT TAXABLE*

I also charge you that whatever amount of damages you award in this case are [sic] not subject to federal income tax.

Delta noted objection to the court's failure to give the instruction. Although the proposed instruction was a correct statement of the federal income tax law (I.R.C. § 104; Rev.Rul. 54–19, 1954–1 C.B. 179), it would have injected into the jury's determination a factor that was irrelevant to the issue of loss to the estate based on lost earning

capacity of the deceased. There was no error in the failure to give this instruction. *Nichols v. Marshall*, 486 F.2d 791 (10th Cir. 1973); *Payne v. Baltimore & Ohio Railroad*, 309 F.2d 546 (6th Cir. 1962), *cert. denied*, 374 U.S. 827, 83 S.Ct. 1865, 10 L.Ed.2d 1051 (1963).[7]

## WHETHER THE DISTRICT COURT ERRED IN ANSWERING A QUESTION ASKED BY THE JURY CONCERNING THE JURY'S CONSIDERATION OF INCOME TAXES IN ARRIVING AT ITS VERDICT.

■ During its deliberations, the jury submitted the following question to the court:

Assuming that her total gross earning over the period of years is X number of dollars—must we consider income tax deduction from the total amount? If the answer is "yes"—what scale of deduction should we use.

The court answered:

The answer to the question is no. You do not make any deductions for income taxes or taxes of any sort.

Now, they have an old saying that nothing is certain in life but death and taxes, and my instructions seem to contradict that. But the reason is what we are talking about is a long period of time. Taxes change, tax rates change, so the law in its infinite wisdom has decided you are not to take taxes into consideration at all. . . .

Delta objected to the answer and contends that the answer should have been "yes." It cites the following from a quotation appearing in *Pierce v. Mowry*, 105 N.H. 428, 201 A.2d 901 (1964):

"But although [earning] capacity is thus made material, it is not declared to be the measure of damages. The loss to the estate by the destruction of that capacity is the measure."

However, the quotation was from *Morrell v. Gobeil*, 84 N.H. 150, 151, 147 A. 413, 414 (1929), where the court declined to equate capacity to earn (earnings over living expenses) with loss to the estate, because "[t]he statute does not require that damages be assessed as though [the decedent's] capacity would be fully employed." By way of illustration, the court said:

If the decedent was a drunken loafer, who though physically able probably would never do a day's work, there would be no loss to his estate if his earning capacity were cut off.

In *McLaughlin v. Union-Leader Corp.*, 100 N.H. 367, 127 A.2d 269 (1956), *cert. denied*, 353 U.S. 909, 77 S.Ct. 663, 1 L.Ed.2d 663 (1957), cited by both parties, the court held that increased income tax liability, if any resulted to the plaintiff from recovery, is not a "loss" within the meaning of the term as used in the assessment of damages in contract actions. In a dictum, the court, commenting on a House of Lords tort case,[8] which held that an award for damages for loss of earnings must be reduced by the amount of income tax and surtax that would have been payable on such earnings, said:

The effect of the holding . . . was to prevent a windfall to the plaintiff, and

7. If there was some basis in the record indicating that the jury would assume that the award was taxable and would, therefore, take such an irrelevant factor into account in its determination, failure to give the requested instruction would have been error. *See McWeeney v. New York, New Haven & Hartford Railroad*, 282 F.2d 34 (2d Cir.), *cert. denied*, 364 U.S. 870, 81 S.Ct. 115, 5 L.Ed.2d 93 (1960); *compare Burlington North, Inc. v. Boxberger*, 529 F.2d 284 (9th Cir. 1975) and *Domeracki v. Humble Oil & Refining Co.*, 443 F.2d 1245 (3rd Cir.), *cert. denied*, 404 U.S. 883, 92 S.Ct. 212, 30 L.Ed.2d 165 (1971). No such basis is present here. Neither of the parties' expert witnesses took income taxes into account in his calculations. Appellant opines that because the trial court told the jury (in response to a question, *infra*) not to make any deductions for income tax from the projected gross earnings of the deceased, there is reason to believe that the jury considered the award to the estate to be subject to income tax—the implication being that the jury increased the award to provide an offset. However, we reject this as pure speculation.

8. *British Transport Commission v. Gourley*, [1956] A.C. 185, [1955] 3 All E.R. 796.

this is consistent with the law which limits damages to actual losses suffered. The comment should be read in light of the fact that the overturned award in the cited case was for £ 37,720, covering a short period of time, which the tax deduction (apparently stipulated) would have reduced to only £ 6,695.

Delta cites this court's opinion in *Turcotte v. Ford Motor Co.*, 494 F.2d 173 (1st Cir. 1974), which involved the Rhode Island wrongful death statute.[9] In reversing and remanding the case for a new trial on the damages issue, this court held, *supra* at 185, that considered "solely in the context of Rhode Island law," the failure of the plaintiff to present evidence on the subject of income taxes constituted error. It stated that the "admittedly speculative nature of income tax evidence cannot be deemed a barrier to its admissibility under Rhode Island law," and observed that the trial court, itself, had noted that the express authorization by the statute for evidence of inflation and other "economic trends" resulted in an unjustifiably large verdict because income tax evidence was excluded. Relying upon *Romano v. Duke*, 111 R.I. 459, 304 A.2d 47 (1973), where the court had presumed that the legislature (when it enacted the wrongful death statute) was familiar with the court's construction of "personal expenses" to include the expenses the deceased would have had to incur "to generate his estimated future earnings or income," this court said:

> It almost goes without saying that income taxes are substantial and inevitable expenses which the decedent would have

had to incur to produce the amounts of future earnings estimated . . . .. In the calculations based on the assumption that the decedent would have been a college graduate, deduction of future taxes would have reduced the final net earnings by a substantial amount, even assuming the use of joint-return rates. [494 F.2d at 186.]

Appellee has not commented on the *Turcotte* case, *supra*, but contends that the holding in *McLaughlin, supra*, that income taxes should not be considered in determining damages in contract actions "stands for the proposition that the impact of taxes should not be considered in making an award" in a wrongful death action under New Hampshire law. However, we are not persuaded that there is such a parallel between the theory of recovery in contract and the theory of recovery for wrongful death. Appellee also cites *McWeeney v. New York, New Haven & Hartford Railroad, supra*, where a divided court held there was no error in the refusal of an instruction that the jury, in calculating loss of earnings, should do so on the basis of plaintiff's net income after deduction of income taxes. However, the majority opinion, while observing that it was following a majority of the courts in taking this position, remarked that in a case involving, for example, a plaintiff with "potential earnings of $100,000 a year, more than half of which would have been consumed by income taxes," an award for damages computed on gross earnings would be "plainly excessive." [10]

**9.** R.I.Gen.Laws § 10–7–1.1 (Supp.1972):

Pecuniary damages—How determined.—Pecuniary damages to the beneficiaries described under § 10–7–2 of this chapter ["Action by executor or administrator, etc."] and recoverable by such persons shall be ascertained as follows:

1. Determine the gross amount of the decedent's prospective income or earnings over the remainder of his life expectancy, including therein all estimated income he would probably have earned by his own exertions, both physical and mental.

2. Deduct therefrom the estimated personal expenses that the decedent would prob-

ably have incurred for himself, exclusive of any of his dependents, over the course of his life expectancy.

3. Reduce the remainder thus ascertained to its present value as of the date of the award. In determining said award, evidence shall be admissible concerning economic trends, including but not limited to projected purchasing power of money, inflation and projected increase or decrease in the costs of living.

**10.** As an example, the majority opinion cited *British Transport Commission v. Gourley, supra*. The dissenting opinion answered that "if

The majority opinion in *McWeeney, supra,* pointed to the plethora of income tax factors (exemptions, optional standard deduction, joint returns, tax rate brackets, tax rates themselves, treatment of other income, tax on interest income used as a basis for discounting future earnings, etc.) on which a jury would require some instructions and said:

> It is answered that, however unrealistic it may be to suppose that a jury could properly make the series of calculations required, the worst result from giving an instruction would be better than the best result from not giving one. This ignores that, by imposing on the jury a task that the jury cannot reasonably be expected to perform, we would be likely to impair the quality of its performance in areas of its true competence.[11]

The dissenting opinion declared that the majority greatly overestimated the task which the jury would be called upon to perform if instructed to take income taxes into account in that particular case, saying:

> It is grossly unfair to defendants to deny an instruction as to future income taxes when such instruction is requested *and the record contains evidence as to taxes.* [282 F.2d at 43. Emphasis supplied.]

Appellee cites *Haney v. Burgin,* 106 N.H. 213, 208 A.2d 448 (1965), as an example of the "practice in personal injury cases in New Hampshire for the trial judge to take the position that the verdict should be arrived at without consideration of the income tax." There the trial judge had responded to an inquiry from the jury by saying that if their verdict was for the plaintiff it should be arrived at without consideration of the income tax; but the New Hampshire Supreme Court, in affirming, merely said it would not consider the matter because the defendant took no exception to the trial judge's answer.

The decisive point on this issue of the case is that there was no evidence whatever before the jury on income taxes; nor did either party's expert witness take income taxes into account in making his calculations.[12] If, in view of this court's holding in *Turcotte,. supra* at 185 ("solely in the context of Rhode Island law"), Delta believed that, under New Hampshire law, the failure of plaintiff-appellee to present evidence on the subject of income taxes was error, it was for Delta to timely raise the point below. *See LaForest v. Autoridad de Las Fuentes Fluviales, supra* at 445. There was no duty for the district court to ask the jury to speculate on the basis of a silent record and no error in the district court's answer to the jury's question.

In view of all the foregoing, the judgment is *affirmed.*

---

the factor is relevant in any case it is relevant in every case."

**11.** *Cf. Boston & Maine Railroad v. Talbert, supra,* which involved damages under the Federal Employers' Liability Act. This court held that evidence of plaintiff's income taxes and railroad retirement contributions was properly ex-

cluded in determining the present value of plaintiff's expected earning capacity.

**12.** We note the condition expressed in the dissenting opinion in *McWeeney, supra* at 43, that "the record contains evidence as to taxes."