ESTATE of Joan E. SPINOSA, by Hazel Dittrich, Administratrix.

ESTATE of Laurie Ann SPINOSA, by Hazel Dittrich, Administratrix.

Paul SPINOSA, Plaintiffs, Appellees,

v.

INTERNATIONAL HARVESTER COMPANY, Defendant, Appellant.

No. 79–1050.

United States Court of Appeals, First Circuit.

Argued Sept. 5, 1979.

Decided April 24, 1980.

---

John Czeciuk, Manchester, N. H., with whom E. Paul Kelly, and Cullity & Kelley, Manchester, N. H., were on brief, for defendant, appellant.

David C. Engel, Exeter, N. H., with whom Shute, Engel & Frasier, P. A., Exeter, N. H., was on brief, for plaintiffs, appellees.

Before COFFIN, Chief Judge, KUNZIG, Judge, U. S. Court of Claims,* and CAMPBELL, Circuit Judge.

KUNZIG, Judge.

This is a diversity case seeking damages for wrongful death and personal injury arising from a single-vehicle traffic accident that occurred almost seven years ago in New Hampshire. The issues presented primarily involve rulings on evidentiary matters and the lower court's refusal to rule on certain products liability issues as matters of law. These are delineated specifically below. We can find no error by the district court and affirm its judgment in favor of plaintiffs.

*Background*

The accident out of which this litigation arose occurred on June 20, 1973, on the Isaac Frye Highway in Wilton, New Hampshire. Joan E. Spinosa was driving a 1966 International Harvester pickup truck down that highway. Her husband, Thomas Spinosa, had bought the truck second-hand in 1971, and in it with her were her daughter, Laurie, and a son, Paul. At some point, a hole developed in the brake tubing of the four-wheel drive vehicle, causing a loss of hydraulic fluid and hydraulic pressure within the braking system. Mrs. Spinosa was unable to control the vehicle as it approached a curve at the foot of a hill, and it crashed into a bridge abutment. She died two weeks later. Laurie Spinosa died in the crash, and her brother, Paul, was injured.

After a three-week trial in the United States District Court for the District of New Hampshire, a jury returned a verdict in favor of plaintiffs.[1]

* Sitting by designation.

1. Judgments for plaintiffs in the following amounts were entered by the District Court on December 8, 1978:

Estate of Joan Spinosa—$120,000.00
Estate of Laurie Spinosa—$120,000.00.
Paul Spinosa—$5,000.00

Defendant then filed this appeal, citing six alleged errors by the district judge. The issues raised may be grouped as follows: I. Did the district judge err when he excluded (a) evidence of prior pleadings in other actions by the plaintiffs, (b) evidence of the effect of income tax on future earnings of the decedents, and (c) evidence of the remarriage of Thomas Spinosa? II. Did the district judge err (a) in refusing to rule that Thomas Spinosa's failure to have the vehicle inspected was an intervening cause of the accident, and (b) by refusing to rule as a matter of law that International Harvester had fulfilled its duty to design a reasonably safe vehicle? Finally, III. Did the district judge err in refusing to order a special verdict?

Though we hold the court did not err in any of its rulings on these issues, we will nonetheless consider each in turn.

## I.

### Exclusions from evidence

#### (a) Admissibility of prior pleadings

International Harvester argues that the district court erred when it excluded from evidence prior pleadings in New Hampshire courts by the same plaintiff (administratrix of the decedents' estates) against Thomas Spinosa. Relying on *Bellavance v. Nashua Aviation & Supply Co.*, 99 N.H. 10, 104 A.2d 882 (1954), International Harvester states that under New Hampshire law the pleadings of plaintiffs in other actions may be introduced in subsequent actions to prove inconsistency in the claims asserted by the plaintiff. The pleadings defendant sought to introduce alleged that the deaths of Mrs. Spinosa and her daughter were caused by the negligent failure of Thomas Spinosa to maintain the truck and have it properly inspected and licensed. International Harvester argues it should have been allowed to show the jury an inconsistency in plaintiff's claim—that in Federal

court plaintiff submitted that the deaths resulted from International Harvester's defective truck, while in State court plaintiff alleged that the deaths resulted from Thomas Spinosa's failure to maintain the truck.

Plaintiffs-appellees respond that it is not inconsistent for suit to be brought successively against Thomas Spinosa and the manufacturer of the motor vehicle, since the pleadings in the prior suit claimed that Spinosa's actions were *a* cause, not *the sole* cause of the accident. *Mihoy v. Proulx*, 113 N.H. 698, 700, 313 A.2d 723, 724 (1973). Since there is no inconsistency, plaintiffs-appellees argue, the pleadings are inadmissible since *Bellavance* states such pleadings are admissible only to show inconsistency in claims asserted by a plaintiff.

We agree with plaintiffs-appellees. In *Bellavance, supra,* plaintiff originally instituted suit against the pilot of an airplane claiming the pilot's negligence was the sole cause of an airplane crash. Plaintiff then sued the company that owned the airplane, claiming that the actions of the company were the sole cause. This claim is indeed inconsistent, as there can not be two *sole* causes of an accident. In the face of such an inconsistency, the court in *Bellavance* admitted the prior pleadings.

In the instant case, however, there is no such inconsistency. It is not inconsistent for suit to be brought against the owner and the manufacturer of the vehicle, since both can have a role in the plaintiff's injury. *Mihoy, supra* at 700, 313 A.2d at 1724. Without such inconsistency, and since pleadings in prior law suits are not evidence of the facts in any particular subsequent suit, *Slocinski v. Radwan*, 83 N.H. 501, 507, 144 A. 787, 790 (1929), the district court had discretion to exclude such material as irrelevant. Absent evidence of abuse of that discretion, we will not upset its ruling.[2]

2. Although the parties have briefed this issue as a question of New Hampshire law, it seems likely that the question is actually controlled by Fed.R.Evid. 403. This rule, however, adds little to the discussion in the text. Because the state court pleadings are not inconsistent with the allegations in the present suit, their relevance is minimal. Moreover, admission of them would potentially prejudice the jury. The trial judge thus had considerable discretion to exclude the

International Harvester also urges that the district court erred when it excluded from evidence the settlement agreement that resulted from the earlier state court proceeding. This contention, however, runs afoul of the statutory prohibition against introduction of such evidence. New Hampshire RSA 507:7-c (Supp.) states that "[E]vidence of a settlement with . . . one or more persons liable in tort for the same injury . . . shall not be introduced in evidence in a subsequent trial by jury of an action against any other tortfeasor to recover damages for the injury or wrongful death. . . ."

■ While Rule 408 of the Federal Rules of Evidence recognizes an exception to the policy embodied in the quoted state statute and admits into evidence such agreements when admitted for the purpose of impeaching the testimony of the party agreeing to the settlement, the district judge properly ruled that the agreement could not function to impeach Thomas Spinosa's testimony, since Spinosa was asked at trial and testified to the fact that he had been sued in state court.

(b) *Tax effect on future earnings*

■ International Harvester contends that it should have been allowed to introduce evidence on the impact income taxes would have had on the future earnings of the decedents. Since damages in wrongful death actions are based largely on projected future earnings of the decedent, International Harvester argues that the damages paid here should have been discounted by a sum representing the income tax liability the decedents would have incurred on such lost future earnings.

Plaintiffs-appellees reply that, although there is no New Hampshire case law on point, the majority rule is that the effect of income tax can not be considered in computing damages. *Kennett v. Delta Air Lines, Inc.*, 560 F.2d 456 (1st Cir. 1977); *see Cunningham v. Rederiet Vindeggen A/S*, 333 F.2d 308 (2nd Cir. 1964); *Damages, Considering Income Taxes*, 63 A.L.R.2d 1393, 1398–1404, Sec. 2,4[a] (1959).

The chief New Hampshire case cited by International Harvester in support of its argument that taxes should be considered in mitigation of a damage award, *McLaughlin v. Union Leader Corp.*, 100 N.H. 367, 127 A.2d 269 (1967), dealt with a rather different issue and involved a contract action, rather than one sounding in tort.[3]

This court has followed the majority rule before, *Kennett, supra*, and we see no reason why the majority rule should not be followed here. We note with interest, however, the Supreme Court's recent decision in *Norfolk and Western Railway v. Liepelt*, —— U.S. ——, 100 S.Ct. 755, 62 L.Ed.2d 689 (1980), in which the Court held that evidence of the tax effect on future earnings should be considered in computing awards under the Federal Employers' Liability Act. Nonetheless, we do not think the district judge erred in excluding such evidence. Without the guidance of a New Hampshire ruling on the issue, the district judge's refusal to deviate from the rule followed by a majority of the states was entirely reasonable, particularly since the Court's *Norfolk and Western* decision does not mandate an across-the-board change in the majority rule regarding computation of a decedent's projected future earnings. *But see Turcotte v. Ford Motor Co.*, 494 F.2d 173, 184–85 (1st Cir. 1974) (Rhode Island law required accounting for taxes). It must be borne in mind that we are dealing with New Hampshire law (or lack thereof) in a diversity situation. This is not a Federal Employers' Liability Act case as was *Norfolk and Western*. Moreover, our research indicates that the *Norfolk and West-*

---

evidence, and because the analysis under *Bellavance* substantially parallels the weighing of relevance and prejudice under the federal rule, we find no reversible error.

**3.** Those cases attempting to spell out New Hampshire's approach to damages in wrongful

death actions are silent on the precise question of whether taxes are to be taken into account. *Thibeault v. Brown*, 92 N.H. 235, 29 A.2d 461 (1942); *Humphreys v. Ash*, 90 N.H. 223, 6 A.2d 436 (1939).

*ern* case stands against a mountain of contrary state authority (*circa* 28 states do not consider tax impact; 6 do). *See annot.*, 63 A.L.R.2d 1393, 1398–1404, §§ 2, 4[a], 5 (1959 & Later Case Service 1976 & Supp. 1979). We hold the majority rule was correctly followed by the district judge in this case.

### (c) *Evidence of Thomas Spinosa's remarriage*

■ Similarly, we can find no merit in International Harvester's contention that it should have been allowed to introduce into evidence, for purposes of mitigating damages, the fact that Thomas Spinosa remarried.

International Harvester maintains that the New Hampshire wrongful death statute allows suit by survivors for damages suffered by survivors after the wrongful death of a loved one.[4] In such a suit brought by a husband after the death of his wife, the argument continues, evidence of the husband's remarriage should be considered in mitigation of damages, since the loss of a wife has been diminished by the presence of a new wife.

The district judge's ruling on this issue, made without the benefit of state law on point, is consistent with the rule followed by a majority of the states. That rule is that remarriage does not affect damages recoverable for the death of a spouse. *Death Action—Remarriage—Effect*, 88 A.L.R.3d 926 (1978). We think it entirely reasonable for the district court to have assumed that New Hampshire courts would follow this majority rule.

### II.

*Law or Fact—Products Liability Issues*

### (a) *Effect of failure to inspect—a question for judge or jury?*

"Plaintiff's misconduct," a term coined by Mr. Justice Douglas of the New Hampshire Supreme Court in *Thibault v. Sears, Roebuck & Co.*, 118 N.H. 802, 395 A.2d 843 (1978), is available as a defense for the

manufacturer whose product is the subject of a product liability suit. "The words 'plaintiff's misconduct' accurately describe what action by the plaintiff, combined with the interaction of a defendant's product, caused an accident or injury." *Id.* at 812, 395 A.2d at 849. International Harvester tried to establish such a defense in this case, by asserting that Thomas Spinosa's admitted failure to have the truck inspected when inspection was due (some two months prior to the accident) was an intervening cause of the accident. The company asked that the effect of this failure to inspect be ruled on as a matter of law, and now alleges that the district court erred when it refused to make such a ruling.

The essence of International Harvester's argument on this point is that had Spinosa had the truck inspected in March as the law required, deterioration of the brake tubing would have been discovered and the accident would have been avoided. The proximate cause of the accident, the company argues, was not its defective brake tubing design but rather Spinosa's failure to have the truck inspected.

In support of this theory, International Harvester cites primarily the testimony of Francis O'Donnell, former head of the state's motor vehicle inspectors. O'Donnell testified at trial that a proper and conscientious inspector would have found that the brake tubing was about to fail. In the face of such evidence, the company maintains, the district judge erred in refusing to rule as a matter of law that Spinosa's failure to have the truck inspected constituted an intervening cause sufficient to prohibit plaintiff's recovery—something of a hybrid "plaintiff's misconduct" defense.

In opposition, plaintiffs-appellees point out that the testimony of Mr. O'Donnell was refuted by *all* of their expert witnesses. More importantly, one of International Harvester's own witnesses, Charles McKenna, whose status as an expert resulted from his extensive research in braking systems, stated that he did not believe normal inspection procedures necessarily would have uncovered the defect.

4. *I. e.*, loss of services as a housekeeper, etc.

■ We think the district judge properly allowed the issue of possible intervening cause to go to the jury. When ruling on motions to withdraw questions of substantive fact and remove them from jury consideration to be ruled upon as matters of law, the judge at trial has little discretion, since fact finding is the essence of the jury function. *Kierstead v. Betley Chevrolet-Buick, Inc.*, 118 N.H. 493, 389 A.2d 429 (1978). When passing on such a motion, the judge must consider the evidence for the plaintiff as true and construe all evidence in the light most favorable to the plaintiffs. *Muzzy v. Rockingham County Trust Co.*, 113 N.H. 520, 521, 309 A.2d 893, 894 (1973); *Keeney v. Avery*, 109 N.H. 561, 562, 260 A.2d 564, 565 (1969). If a substantial question of fact is presented, the question should then go to the jury. Hursh & Bailey, American Law of Products Liability 2d, § 9:20 at 310–311 (1974).

With this standard in mind, the district judge properly ruled that the question of intervening cause was one for the jury to decide as a matter of fact. The jury could quite reasonably have believed that the failure to inspect had no bearing whatsoever, since there was a great deal of testimony to the effect that no inspection would have revealed the developing hole in the brake tubing. *See Hackett v. Perron*, N.H., 402 A.2d 193 (1979), where sudden brake failure occurred just two weeks after brakes were inspected.

Had the defect in the case at bar been more apparent—something more than a pinhole in steel tubing covered with road grime—we might have a closer case, for then the likelihood of discovery in an inspection would be far greater. But here the conflicting evidence did not permit a ruling as a matter of law that the accident resulted from the failure to have the truck inspected.

■ We hold it was for the jury in this case to decide as a question of fact whether the accident resulted from failure to inspect or defective design. The district judge properly let the jury answer the question.

(b) *Reasonableness of product design—a question for judge or jury?*

Essentially, International Harvester argues its pickup truck product design was proper and adequate; plaintiffs-appellees allege the use of other and more appropriate design standards might well have prevented the tragedy.

■ The company attempted to show that its product, the 1966 Model D1100 (4 × 4) pickup truck—and in particular, the brake tubing and interior design of the truck—was equal to the general manufacturing standard of the day and therefore not defectively designed. In keeping with that logic, Harvester maintains that the district judge erred when he refused to rule as a matter of law that the company had fulfilled all duties owed as a manufacturer to the consumers of its product.[5]

■ We disagree, and hold that there was sufficient conflicting evidence on the issue of design reasonableness to bring it within the province of the jury.

Just what was International Harvester's duty in manufacturing a vehicle? We had occasion to review the duty owed to consumers in *Mitchell v. Ford Motor Co.*, 533 F.2d 19 (1st Cir.), *cert. denied*, 429 U.S. 871, 97 S.Ct. 183, 50 L.Ed.2d 151 (1976). There

---

5. Nestled in International Harvester's overly conclusory argument on this point is a challenge to the district judge's admission into evidence of manufacturing standards and design changes that *post-dated* manufacture of the truck in question. While we agree with the company that such post-manufacture evidence can not be used to prove the defective design of the product at the time it was manufactured, Hursh & Bailey, American Law of Products Liability 2d, § 9:19 at 308 (1974), we note that such evidence *is* admissible when used to rebut testimony asserting that particular designs are not feasible. *See Underhill v. Baker*, 115 N.H. 469, 343 A.2d 643 (1975); *Reynolds v. Maine Mfg. Co.*, 81 N.H. 421, 128 A. 329 (1925).

In the instant case, the district judge admitted into evidence the fact that Harvester itself changed design shortly after the 1966 model year, adding a dual brake design and adding padding to the cab. This was after the company asserted such design modifications were not feasible.

we recognized that manufacturers are not required to build a product that will not wear out. *Id.* at 20. Nor are they required to provide a perfect product, for there is "probably little that could not be improved, or, at least, that some person having sufficient qualifications to be called an expert would not say could have been improved . . . ." *Id.* Manufacturers like International Harvester are "not obligated to design the safest possible product, or one as safe as others make or a safer product than the one . . . designed, so long as the design . 527 527 adopted is reasonably safe." *Id.*, quoting W. Prosser, The Law of Torts § 96, at 645 (4th ed. 1971).

Generally, International Harvester's defense amounted to an attempt to show that, in manufacturing a product equal to those manufactured by other companies, it had provided a "reasonably safe" vehicle. Harvester asserted it had no duty to provide a dual braking system (in which a back-up system could continue to stop the vehicle despite a loss of brake fluid) or safer interior design, since neither was employed generally in the industry at the time. Whether other designs were available was of no consequence. Harvester adds, given this equality with general industry standards. Therefore, the argument concludes, the district court should have ruled as a matter of law that Harvester had fulfilled its duty to manufacture a reasonably safe vehicle, that it was under no other duty as a matter of law to produce a better or different product than it had built.

Plaintiffs-appellees, on the other hand, attacked with vigor the reasonableness of designing a brake system with tubing subject to corrosion and a vehicle which lacked a back-up system in the event of brake failure. They offered as evidence patents showing the development of dual braking systems in the 1930s. They offered testimony that the Federal government used dual brake systems on its vehicles in World War II and that the Congress required dual systems on government vehicles in 1965.

In addition, expert testimony was offered on the corrosive nature of the steel tubing used and the likelihood that sudden failure could someday result from corrosion. Moreover, plaintiffs-appellees offered proof that safer brake and interior designs were feasible through evidence that shortly after the manufacture of the truck in question, in late 1966, International Harvester switched to the dual brake system and added significant padding inside the cab.[6]

Clearly this volume of pertinent evidence, all properly introduced, adds up to controversy sufficient to send the issue to the jury.

We disagree with International Harvester's disregard for the importance of considering alternate designs in products liability cases. In *Larue v. National Union Elec. Corp.*, 571 F.2d 51 (1st Cir. 1978), we approved the introduction into evidence of a vacuum cleaner which incorporated safety features left out of another model which plaintiff sought to prove was defectively designed. We held evidence of comparable designs to be relevant to the issue of a manufacturer's "awareness of both design alternatives and the existence of potential hazards . . . ." *Id.* at 57. Whether International Harvester's product was reasonably designed similarly turns on questions of design alternatives and potential hazards—clearly questions for the jury.

Moreover, in arguing that the district judge erred when he refused to take the issue away from the jury and decide it as a matter of law, International Harvester has overestimated the strength of its case and its attempted showing of a reasonably safe product. The mere showing of equality with industry standard is not so overwhelming a case for the manufacturer as to justify removing the case from jury consideration. As Judge Learned Hand wrote in the landmark case of *The T. J. Hooper*, 60 F.2d 737, 740 (2d Cir.), *cert. denied*, 287 U.S. 662, 53 S.Ct. 220, 77 L.Ed. 571 (1932), an industry "never may set its own tests, however persuasive be its usages. Courts must in the end say what is required." *See general-*

---

6. See note 5, *supra.*

*ly Burgess v. M/V Tamano*, 564 F.2d 964, 981 (1st Cir. 1977), *cert. denied*, 435 U.S. 941, 98 S.Ct. 1520, 55 L.Ed.2d 537 (1978); W. Prosser, The Law of Torts, § 33 at 167 (4th ed. 1971).

▆ Assuming, *arguendo*, that the pickup truck was on a par with other products in the industry, there is still a question as to whether the entire industry itself was behaving in unreasonable fashion by failing to incorporate better braking systems and interior compartments which were available. Determining the answer is a question of *fact* properly in the jury's domain, and the district judge correctly so ruled.

### III.

### *Special Verdict*

Finally, we touch briefly on the question of whether the district judge should have ordered a special verdict from the jury. International Harvester has argued that a special verdict was appropriate because of the "numerous and complex" issues to be decided by the jury, and because, if plaintiffs prevailed, it wanted a definitive ruling on whether the brake tubing was *the* proximate cause of the accident so that it could later demonstrate the liability of the manufacturer of that part.

▆ The use of special verdicts, in which the jury is required to rule specifically on stated questions of fact on which the verdict necessarily relies, is usually a matter committed to the discretion of the trial judge. *Bank of Nova Scotia v. San Miguel*, 196 F.2d 950 (1st Cir. 1952); *Putnam v. Bowman*, 89 N.H. 200, 195 A. 865 (1938); 9 Wright & Miller, Federal Practice and Procedure: Civil § 2505 (1971). We do not believe in the instant case that the district judge abused that discretion in refusing to use a special verdict, particularly when given the law in force when the case was decided.

In 1969, New Hampshire passed RSA 507:7–a (Supp.) which required that in negligence cases juries consider plaintiff's negligence as compared to defendant's negligence and announce any damage award "by general verdict." On numerous occasions we endorsed the application of that statute not only in negligence cases but in cases tried in strict liability in tort as well. *Rodrigues v. Ripley Industries, Inc.*, 507 F.2d 782 (1st Cir. 1974); *Cyr v. B. Offen & Co.*, 501 F.2d 1145 (1st Cir. 1974); *Stevens v. Kanematsu-Gosho Co.*, 494 F.2d 367 (1st Cir. 1974).

Then, in 1978, the New Hampshire Supreme Court ended the application of the statute in strict liability cases, stating that RSA 507:7–a "does not apply to strict liability cases because it [the statute] is confined by its terms to actions for negligence . ." *Thibault v. Sears, Roebuck & Co.*, 118 N.H. 802, 395 A.2d 843, 848 (1978). The court, however, specifically stated that the change set forth in its opinion in *Thibault* would apply to "cases tried thirty days and thereafter from the date of this opinion." *Id.* at 814, 395 A.2d at 850. The date of the opinion was November 30, 1978. The case at bar went to trial on November 20, 1978. Accordingly, it was to be tried under the law as announced by our decisions in the three cases noted in the preceding paragraph. These three decisions all applied RSA 507:7–a and its mandatory use of the general verdict. The district judge thus did not err by submitting the case to the jury for resolution by general verdict. On the contrary, he was following applicable precedent in doing so.[7]

In sum, after consideration of the parties' submissions and after oral argument, we hold the district judge properly excluded from evidence prior pleadings from state court, the tax effect on decedents' future earnings and Thomas Spinosa's remarriage. The district judge correctly submitted to

---

7. Even if *Thibault* were the law of this case, the use of special verdicts is apparently not mandatory. In rejecting application of RSA 507:7–a (Supp.1977) and its general verdict requirement in the strict liability context and announcing new rules, the Court spoke in permissive terms: ". . . the jury should then *usually* be asked by special verdict if plaintiff's proof has

met the requirements of the Restatement. . . . ." 118 N.H. at 813, 395 A.2d at 850; ". . . trial judges have the *inherent power* to use special questions and verdicts to guide the jury . . . ." *Id.* "Use of the special verdict is permissible in strict liability cases despite the language of RSA 507:7–a . . ." *Id.* [Emphasis added].

the jury the issues of failure to inspect and product design reasonableness. We further hold that no special verdict was necessary in this case.

*Affirmed.*

LEVIN H. CAMPBELL, Circuit Judge (concurring).

Since *Norfolk & Western Railway v. Liepelt,* —— U.S. ——, 100 S.Ct. 755, 62 L.Ed.2d 689 (1980), I am concerned whether we, as a federal court, can properly continue to assume that the New Hampshire rule is to refuse to consider the impact of taxes on future earnings. However, this case was tried prior to that case, at a time before the Supreme Court had expressed its views and when (as still remains true) a very sizeable majority of states refused to consider taxes. Neither side requested us to certify this issue to the New Hampshire Supreme Court. Seven years have elapsed since the accident. Accordingly I feel it is undoubtedly the better part of wisdom to proceed as the court does. In subsequent New Hampshire diversity cases, however, I wish to say that I see this matter as a prime candidate for certification to the New Hampshire Supreme Court now that the United States Supreme Court has thrown its weight to the other side—assuming the New Hampshire courts have not by then spoken.